[No. 39420.     Department Two.     July 11, 1968.]

CENTRAL HEAT, INC., *Appellant,* v. THE DAILY OLYMPIAN, INC., *Respondent and Cross-appellant.*\*

\*Reported in 443 P.2d 544.

*Francis J. Walker*, for appellant.

*Brodie, Fristoe & Taylor*, by *Doane Brodie*, for respondent and cross-appellant.

ARMSTRONG, J.†—This action arises out of a claim by Central Heat, Inc., a Washington corporation, for money due under an agreement to furnish steam heat to the premises of the Daily Olympian, Inc., also a Washington corporation. Suit was brought on May 2, 1965. The trial court found the defendant liable, but held that the statute of limitations, as set forth in RCW 4.16.080, barred the bulk of the claim, which accrued prior to May, 1962. The plaintiff appealed, and the defendant has cross-appealed.

The plaintiff, Central Heat, Inc., hereinafter referred to as Central Heat, operated a steam generation and distribution system in the city of Olympia, Washington. The defendant, The Daily Olympian, Inc., hereinafter referred to as Daily Olympian, the National Bank of Commerce, Olympia branch, and the Security Building were the three largest customers served by plaintiff. Representatives of some of the businesses served, including Mr. Jack Britten, who was business manager of the Daily Olympian at the time this controversy arose, served on the Central Heat board of directors. Mr. E. M. Chandler, who operated the Security Building, served, without compensation, as president of Central Heat.

Although there were some other users, Central Heat's operation was directed primarily toward providing steam heat to these three largest customers. Service to all three was essential to the economic life of plaintiff, and the loss of any one of the three would require plaintiff to cease operations. For this reason customers were required to take steam heat for the entire heating season—a period from about September 15 to June 1. Billings were sent out monthly. Should the heating company run operational

†Judge Armstrong is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

deficits in costs over income, the customers were assessed a surcharge at the end of the heating season, based on a percentage of steam used.

The defendant, in 1958, contemplated conversion to another means of heat, and so commissioned an architectural and engineering firm to prepare a heating and cooling survey. Written notice of defendant's intent to decrease or terminate its steam use was sent to the plaintiff by defendant's business manager, Mr. Britten. The text of the letter, dated April 7, 1958, is as follows:

> Since our last telephone conversation we have made no firm committments concerning our heating program for next season. It does appear likely however that our use of steam from Central Heat will be severly [sic] curtailed if not entirely eliminated.
>
> Cost is the factor causing our change. Other forms of heat offer us an annual operating expense of about one-third that of steam. In fact, we can supplement our present gas heaters with additional units which will heat the entire building and pay for the heaters in one season from operating savings.

As a result of this letter a special meeting of the Central Heat board of directors was called. Mr. Britten was in attendance and offered to consider a gradual reduction in defendant's use of steam, rather than immediate termination. Defendant did in fact continue to take steam for the area it occupied, as well as for the area occupied by its wholly-owned, job-printing department, Capital City Press. The following chart shows the amount paid by defendant for steam heat for the 1958-59 through the 1961-62 heating seasons:

|  |  | Season Total | Surcharge | Total |
|---|---|---|---|---|
| 1957–1958 | Daily Olympian .. | $3,194.44 | $319.44 | $3,513.88 |
| 1958–1959 | Daily Olympian .. | 3,127.32 | 156.37 | 3,283.69 |
|  | Capital City Press | 145.00 | 7.25 | 152.50 |
| 1959–1960 | Daily Olympian .. | 3,111.90 | 155.60 | 3,267.50 |
|  | Capital City Press | 174.67 | 8.73 | 183.40 |
| 1960-1961 | Daily Olympian .. | 2,451.50 | 245.15 | 2,696.65 |
|  | Capital City Press | 168.67 | 16.86 | 185.53 |
| 1961–1962 | Capital City Press | 172.67 | 34.53 | 207.20 |

In the summer of 1961 Mr. Tom Richards, vice-president of the National Bank of Commerce, Olympia branch, notified Central Heat that the bank did not intend to purchase steam heat in the forthcoming heating season. This brought about a meeting attended by the president of Central Heat, Mr. Chandler, Mr. Richards, and Mr. Britten of the Daily Olympian. At this meeting it was mutually agreed that the three largest users of steam heat (the National Bank of Commerce, Olympia branch, the Daily Olympian, and the Security Building) would continue to take steam through the 1961-62 season, but thereafter terminate steam consumption and Central Heat would close operations.

During the 1961-62 heating season monthly statements were submitted to the defendant, Daily Olympian, for service to itself and to its subsidiary, Capital City Press. Billings for the latter, which represented actual steam used plus the surcharge, have been paid by defendant. Billings to defendant were computed on the basis of defendant's average monthly use of steam in the prior 5 year period, rather than on the basis of actual steam used; this was provided for in the rates and regulations for the year 1961-62 approved by the Central Heat board of directors August 31, 1961.[1] In

---

[1]"Central Heat, Inc., Rates and Regulations, 1961-1962 Season: The rate for steam heat for the 1961-1962 season will be the same as for 1960-1961, but adjusted to meet changes in the cost of fuel (current price $3.19 per barrel). If the price of fuel should be changed, either up or down, the price for steam will be adjusted in proportion. The following regulations apply:

"1. Heat is furnished *only* on a seasonal basis to customers with approved credit. This means that the customer is obligated to take heat for the whole season. If he should reduce or discontinue the amount normally required, the customer will be obligated for the normal amount. This will be computed by comparing the use in previous years. The foregoing provisions are basic because our plant cannot operate without a substantial volume.

"2. The Company must pay its bills, so, to operate at all, is obliged to go on an assessment basis. By this is meant that if, by the end of the season, expenses have gone above receipts, then a surcharge will be levied to make up the deficit. A detailed financial statement will be furnished."

July, 1962 defendant served notice on plaintiff that it refused to pay these bills. This action followed.

In the trial court defendant was found liable by an application of the doctrine of promissory estoppel. However, the court also found that the 3-year statute of limitations, RCW 4.16.080, barred plaintiff's claim, except for sums accruing after May 2, 1962. Judgment was therefore entered for an amount covering the billings for May and June, 1962, plus the surcharge, which was assessed in July, 1962—a total of $686.12, including interest. The sum demanded by plaintiff was $3,523.40, plus interest.

Plaintiff has three assignments of error, two of which challenge the trial court's refusal to conclude that liability arose out of a written agreement so that the 6-year statute of limitations,[2] and not the 3-year statute of limitations,[3] would be applied. Plaintiff's second assignment of error is directed to the trial court's failure to conclude as a matter of law that defendant was estopped to invoke the statute of limitations as a defense.

On the first issue plaintiff recognizes that there was no writing signed by a representative of defendant. However, it is plaintiff's contention that the rates and regulations adopted by Central Heat, together with the corporate minutes and records, comprised the necessary writing out of which defendant's liability arose. To support this contention plaintiff cites *DeBritz v. Sylvia*, 21 Wn.2d 317, 150 P.2d 978 (1944) and *Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 423 P.2d 624 (1967).

■ In the *DeBritz* case the defendant took possession of the premises in question under a written option contract, signed by plaintiff only, which contract set out the terms

---

[2]"RCW 4.16.040 Actions limited to six years. Within six years:
" . . . .
"(2) An action upon a contract in writing, or liability express or implied arising out of a written agreement."

[3]"RCW 4.16.080 Actions limited to three years. Within three years:
" . . . .
"(3) An action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument; . . . ."

of the sale and the price. After plaintiff executed the option it was delivered to the defendant. In plaintiff's suit to recover an unpaid portion of the purchase price this court held that the action arose out of the written agreement which, while of itself unilateral in nature, became binding on the parties when defendant took possession and thereby elected to exercise his rights under the written option. The 6-year statute of limitations was properly held to apply.

We conclude that the facts of the case before us are distinguishable from this option situation. Under the option agreement the parties thereto were specifically identified by name in the writing, and the vendor-vendee relationship arose between them once the defendant assumed the role of purchaser and by his actions impliedly accepted the offer contained in the option. Moreover, the written document upon which he acted was in fact delivered to him before he committed the acts from which his acceptance was implied.

In the instant case there was no document delivered to defendant prior to the 1961-62 heating season. Also, the rules and regulations and corporate minutes of Central Heat were not intended to fix a relationship between this particular defendant and Central Heat. The minutes, rules and regulations were primarily intended to regulate the internal affairs of plaintiff corporation. Customers were bound by them once the customer relationship was otherwise established. We cannot say that as a matter of law these rules, regulations, and corporate minutes were the basis of a written contract liability, express or implied.

In the second case cited by plaintiff, *Sanwick v. Puget Sound Title Ins. Co., supra*, the defendant title insurance company accepted and acted upon an escrow instruction left with it, which instruction was entered on defendant's printed forms. The court followed the *DeBritz* rule, and found that all the elements of a valid written contract were present. It must be noted that in this case, also, a written instrument was delivered to and accepted by the defendant; the parties involved were also specifically identified on the face of the instrument. We do not find this case in point.

We find the rule stated in *Purvis v. PUD No. 1*, 50 Wn.2d

204, 208, 310 P.2d 233 (1957), to be a closer analogy to the facts of this case. In *Purvis* the plaintiff brought suit to recover compensation for legal services rendered to the defendant public utility district. In the minutes of the board of commissioners of the district, plaintiff was identified by name and authorized to perform specific legal services. However, there was no written memorandum or instrument transmitted to plaintiff. The court found evidence of an express contract to employ plaintiff, but stated at 208:

> The minutes of the board of commissioners, quoted *supra*, fall short of constituting a contract in writing, or liability express or implied arising out of a written contract. *Aall v. Riverside Irr. Dist.*, 157 Wash. 442, 444, 289 Pac. 22 (1930), and cases cited. Therefore, plaintiff's action, which was commenced October 28, 1954, is governed by the three-year statute of limitations.

To the same effect see *Evans v. Yakima Valley Grape Growers Ass'n*, 52 Wn.2d 634, 328 P.2d 671 (1958).

Therefore, we must conclude that the trial court did not err in refusing to find that this was an action upon a written contract, or that there was liability, express or implied, arising out of a written agreement. And thus, the 3-year statute of limitations was properly held applicable in this case.

The trial court determined liability by application of the doctrine of promissory estoppel. It chose this theory because it expressed doubts regarding the element of consideration, in that the Daily Olympian did not actually use any heat for itself during the heating period of 1961-62.

The five prerequisites for a cause of action in promissory estoppel have been stated in *Corbit v. J. I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967), as follows:

> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

*Accord: Hilton v. Alexander & Baldwin, Inc.*, 66 Wn.2d 30,

400 P.2d 772 (1965); *Weitman v. Grange Ins. Ass'n,* 59 Wn.2d 748, 370 P.2d 587 (1962); *Hill v. Corbett,* 33 Wn.2d 219, 204 P.2d 845 (1949); Restatement, Contracts § 90 (1932); Annot., 48 A.L.R.2d 1070 (1956).

■ Further explanation of the doctrine of promissory estoppel is contained in *Lacy v. Wozencraft,* 188 Okla. 19, 20, 105 P.2d 781 (1940), wherein the court stated:

> [P]romissory estoppel . . . is based upon the same equitable principles as is estoppel by silence. In the one case a promise is made with the intention that it be acted upon by the promisee; in the other, a person has been silent on some occasion when he should have spoken. But in either case the party who is estopped has in effect stood by and, in violation of his duty in equity and good conscience to warn another of the real facts, permitted the latter to take some action detrimental to his own interest.
>
> In order for estoppel to arise in such case it is not necessary that the one estopped receive some benefit or consideration from the particular transaction; neither is it necessary that he be guilty of some actual overt act of fraud.

The trial court applied the five rules set forth in *Corbit v. J. I. Case Co., supra,* to the facts of this case, stating as follows:

> The court is satisfied that by the failure to comply with giving written notice under the rules and regulations of 1960-61 and by the failure to give oral notice an implied promise arose which the promissor should reasonably expect to cause the promisee to change his position, being in this case the ceasing of operations, and which did cause the promisee to continue the operation thereof, justifiably and relying upon the promise in such manner that injustice could be avoided only by enforcement of the promise. Even though there was no consideration or direct assent, these are not requisite to the enforcement of the doctrine of promissory estoppel.

■ We concur with the trial court's analysis, and add that the promise defendant's manager, Mr. Britten, made at the meeting with the manager of the bank and the manager of Central Heat, to continue taking heat through the 1961-62 season, clearly justified the trial court in its analysis

of the evidence. The rates and regulations approved by the defendant's board of directors on August 31, 1961 further clarified the terms of the promise (see footnote 1). The evidence in this case establishes a proper application of the doctrine of promissory estoppel.

Plaintiff's second assignment of error deals with the doctrine of equitable estoppel to assert the statute of limitations. This assignment is based on the conduct of defendant Daily Olympian's business manager, who, prior to the beginning of the heating season, entered into a contract for the availability of a supply of steam from plaintiff. Plaintiff contends that he then concealed the facts necessary for an understandable commencement of action until the end of the heating season. Apparently, plaintiff is referring to the silence of the business manager, Mr. Britten, until July, 1962, when he sent notice to plaintiff that the Daily Olympian refused to pay the bills sent by plaintiff.

The elements of estoppel were present at the start of the statutory period (May, 1962) and before, so that the trial court was justified in applying the doctrine of promissory estoppel to create the cause of action. However, the fact that estoppel was found and applied for this purpose does not necessarily mean that it may be applied to deny the defendant the defense of the statute of limitations.

The equitable doctrine of estoppel in pais is applicable in a proper case to prevent a fraudulent or inequitable resort to the statute of limitations as a defense. *Bain v. Wallace,* 167 Wash. 583, 10 P.2d 226 (1932); 34 Am. Jur. *Limitation of Actions* § 411 (1941); Annot., 130 A.L.R. 15 (1940); Annot., 24 A.L.R.2d 1413 (1952). One such situation exists where the defendant conceals facts or otherwise induces the plaintiff not to bring suit within the period of the applicable statute of limitations. *Robbins v. Wilson Creek State Bank,* 5 Wn.2d 584, 105 P.2d 1107 (1940); *Edwards v. Surety Fin. Co.,* 176 Wash. 534, 30 P.2d 225 (1934); *Marshall-Wells Hardware Co. v. Title Guaranty & Sur. Co.,* 89 Wash. 404, 154 Pac. 801 (1916); 34 Am. Jur. *Limitation of Actions* § 413 (1941).

However, plaintiff does not state facts which bring it

within the operation of this rule. A search of the record reveals no act or omission of defendant, Daily Olympian, which induced plaintiff, Central Heat, not to bring suit until May 2, 1965. Plaintiff knew in July, 1962 that defendant had refused to pay the monthly billing, yet no action was taken for a period of 2 years and 10 months later.

Facts and circumstances which create an estoppel at one point in time do not justify an unreasonable suspension of the statute of limitations. A party claiming estoppel to prevent an inequitable resort to the statute of limitations may not sleep on his rights. A statement on the duration of estoppel is found in Annot., 24 A.L.R.2d 1413, 1423 (1952):

> [W]here the inducement for delay or the hindrance to the commencement of an action has ceased to operate before the expiration of the limitation period, so as to afford the plaintiff ample time thereafter in which to institute his action prior to the running of the statute of limitations, he cannot excuse his failure to do so on the ground of estoppel.
>
> The plaintiff must show reasonable diligence in bringing his suit after the estoppel has expired. La Porte v. United States Radium Corp. (1935, DC NJ) 13 F Supp 263.

*Accord: Regus v. Schartkoff,* 156 Cal. App. 2d 382, 319 P.2d 721 (1957).

This rule is applicable to the case before us, and consequently we find no merit to plaintiff's contention that the defendant should be estopped from asserting the statute of limitations as a bar to this suit.

### THE CROSS-APPEAL

Defendant has three assignments of error upon which it bases its cross-appeal.

Finding of fact 11 is challenged in that it states that in the promise of Mr. Jack Britten to continue through the 1961-62 heating season was implied the promise to pay for heating based on the use in the plant of the Daily Olympian over and above that steam used in the Capital City Press.

Finding of fact 12 is challenged in that it states that the Daily Olympian gave no notice of its intention to discontinue or reduce taking heat in the 1961-62 season.

The third assignment contends that it was error to grant judgment in favor of plaintiff for any amount whatever. This is based on the contention that inasmuch as the plaintiff knew, as early as April, 1958, that defendant, Daily Olympian, intended to convert to another form of heating, plaintiff should have given notice of its intention to charge defendant on the basis of average use in the 5 prior years. Also, defendant asserts that plaintiff, Central Heat, should be estopped from claiming liability when it accepted the benefit of defendant's offer to decrease its use of steam on a gradual basis, rather than all at one time.

We find no merit to defendant's arguments. Defendant was well aware of the fact that if any one of the three major users of steam failed to take steam during the 1961-62 season Central Heat could not operate. At the meeting with the bank manager and the manager of Central Heat in the summer of 1961, defendant's manager agreed to continue to take heat during the 1961-62 season. As a member of the board of directors of Central Heat, defendant's manager participated in the development of rates and regulations, which provided that if any customer should reduce or discontinue the amount of heat normally required, the customer would be obligated for the normal amount, which would be computed by comparing the use in prior years (see footnote 1). Central Heat had no reason to expect that Daily Olympian would drop from $2,696.65 for steam consumption in the 1960-61 season to nothing in the 1961-62 season. Central Heat had a right to rely upon defendant's compliance with the rates and regulations for 1961-62, which would obligate the Daily Olympian to pay the normal amount to be computed by comparing the use in prior years. There is no evidence that defendant gave notice to terminate its obligations prior to the end of the 1961-62 season. We see no reason why plaintiff, Central Heat, should be estopped from asserting its claim.

The judgment is in all respects affirmed.

WEAVER, HUNTER, HAMILTON, and NEILL, JJ., concur.