44 P.3d 894 (2002)
111 Wash.App. 306
Bernard W. PETERSON, Appellant,
v.
James L. GROVES and Joanna C. Groves, husband and wife, Respondent.
No. 49071-1-I.
Court of Appeals of Washington, Division 1.
April 22, 2002.
*895 Malcom Harris, Aaron Lee, Seattle, for Appellant.
Steven Michael, Everett, for Respondent.
KENNEDY, J.
Bernard Peterson appeals the summary dismissal of his suit to collect on two promissory notes for loans he made to his stepson James Groves. Peterson argues that Groves is equitably estopped from asserting the statute of limitations as a defense, in that Groves lulled him into inaction by falsely promising to pay off the notes with proceeds from the sale of land. Peterson has presented sufficient evidence to establish the elements of equitable estoppel. However, because Peterson has not shown due diligence in bringing his claim once the estoppel period ended, we affirm.

I
Bernard Peterson is the stepfather of co-defendant James Groves. Peterson married Groves' mother in 1955, when Groves was 11 years old. Although Peterson never adopted Groves, Peterson stated that he became a father figure for the boy, that he thought of Groves as his son, and that they "developed a long, trusting relationship over the years that seemed to grow stronger with age."
Peterson loaned money to James Groves and his wife Joanna Groves at various times prior to 1985. These loans were reduced to two promissory notes, executed in 1982 and 1985. Both James and Joanna Groves signed the notes. The first note was dated September 14, 1982, in the amount of $58,441.17, carrying 10 percent interest, and payable one year later. Under RCW 62A.3-118(a), that note became time barred 6 years after it became payable, on September 14, 1989. The second note was dated January 23, 1985, in the amount of $79,465.20, carrying 12 percent interest, and payable on demand. Under RCW 62A.3-118(b), that note became time barred 10 years later, on January 23, 1995.
According to Peterson, sometime after 1985, the defendants informed him that they planned to pay off the notes with the proceeds from the sale of ten acres of commercial property they owned in Everett. Peterson explained that because of his close relationship with Groves, he trusted and believed the promise to pay off the notes when the property sold. The defendants attempted to sell the property for 10 years, but to no avail. Peterson stated that during this time, the defendants continued to promise that they would pay off the notes as soon as they sold the property. The defendants sold the property in June 1998 for approximately 3 million dollars, and received the proceeds from the sale early in 1999. However, they did not pay the notes.
On March 15, 1999, Peterson's attorney wrote a letter to James Groves requesting, among other things,[1] that he pay off the notes with the proceeds from the sale of the property. The letter indicated that if Groves did not pay off the notes within 30 days, Peterson would "insist upon a promissory note secured by a deed of trust on real property or other comparable security." Groves still did not pay off the notes.
The letter to James Groves from Peterson's attorney also refers to an unrelated business transaction between Peterson and Groves, whereby Peterson invested $128,000 in a recycling project at Groves' request. The letter stated that in spite of numerous requests, Peterson still did not have an accounting *896 of how his money was invested, nor of the present status of the project. The letter asked for a complete accounting of the distribution of Peterson's $128,000 investment, including copies of letters "concerning the promised return on the investment."
Peterson filed suit against James and Joanna Groves in January 2001. This was more than 11 years after the statute of limitations ran on the first note and 6 years after it ran on the second note. It was 2-½ years after the sale of the property. And it was 19 months after Peterson's attorney's letter demanding payment within 30 days.
James and Joanna Groves filed a motion for summary judgment, raising the statute of limitations as an affirmative defense. Peterson argued that the defendants were equitably estopped from asserting the statute of limitations because Peterson was lulled into inaction by their promises to pay when the land sold. The trial court granted summary judgment to Groves. Peterson appeals.

II
When reviewing an order granting summary judgment, the appellate court engages in the same inquiry as the trial court. Enterprise Leasing, Inc. v. City of Tacoma, 139 Wash.2d 546, 551, 988 P.2d 961 (1999). The appellate court will affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). All facts and reasonable inferences must be considered in the light most favorable to the nonmoving party. Mountain Park Homeowners Ass'n, Inc. v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
"Equitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence." Robinson v. City of Seattle, 119 Wash.2d 34, 82, 830 P.2d 318 (1992). The elements to be proved are: (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission. Id. Estoppel is appropriate to prohibit a defendant from raising a statute of limitations defense when a defendant has "fraudulently or inequitably invited a plaintiff to delay commencing suit until the applicable statute of limitations has expired." Id., quoting Del Guzzi Constr. Co., Inc. v. Global Northwest Ltd., Inc., 105 Wash.2d 878, 885, 719 P.2d 120 (1986).
The gravamen of equitable estoppel with respect to the statute of limitations is that the defendant made representations or promises to perform which lulled the plaintiff into delaying timely action. Allan E. Korpela, Annotation, Promises To Settle or Perform as Estopping Reliance on Statute of Limitations, 44 A.L.R.3d 482, § 4(a) (1972); Herman v. Brown, 91 Cal.App.2d 758, 205 P.2d 1086, 1088 (1949).
An unwritten promise may give rise to an estoppel to prevent the use of the statute of limitations if reasonably relied upon. Schroeder v. Young, 161 U.S. 334, 16 S.Ct. 512, 40 L.Ed. 721 (1896); Limitation of Actions, 51 Am.Jur.2d § 445. Courts consider a variety of facts and circumstances in determining whether the plaintiff reasonably relied on such promises in delaying action. In some cases, the case for estoppel is strengthened by the fact that a promise to pay has been related to the happening of a specific event. Id., citing Langdon v. Langdon, 47 Cal.App.2d 28, 117 P.2d 371 (1941) (defendant promised to pay once he got a good start in his business); Kreielsheimer v. Berryman, 85 Wash. 175, 147 P. 871 (1915) (defendant promised to pay debt after termination of suit against person secondarily liable). However, a mere promise to pay, in the absence of other factors supporting the application of equitable principles, may not be sufficient grounds to avoid application of the statute of limitations. Id. at 176, 147 P. 871.
The existence of a close family relationship has been held to be an important factor as a basis for reliance. Allan E. Korpela, Annotation, Fiduciary or Confidential Relationship As Affecting Estoppel to Plead Statute of *897 Limitations, 45 A.L.R.3d 630 (1972); see also Korpela, supra, 44 A.L.R.3d at 500; Bogan v. Wiley, 196 P.2d 621 (Cal.App.1948), rev'd on other grounds, 90 Cal.App.2d 288, 202 P.2d 824 (1949) (finding confidential relationship supporting equitable estoppel where mother-in-law promised widowed son-in-law that her partnership interest would be left to him to satisfy debt to deceased wife, where parties were close and lived together until son-in-law's remarriage); Langdon, 47 Cal. App.2d 28, 117 P.2d 371 (1941) (substantial evidence to support equitable estoppel, where son promised to pay father in 3 years when his contracting business improved). However, many courts hold that the mere existence of a family relationship, without more, is insufficient to establish a "confidential" relationship between the parties to justify application of equitable estoppel. 45 A.L.R.3d 630, 633. In McCutcheon v. Brownfield, 2 Wash.App. 348, 467 P.2d 868 (1970), the court explained that:
A confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation is particularly likely to exist where there is a family relationship....
Parentage alone does not necessarily create a confidential relationship between parent and child. There must be something more. However, the fact of parentage frequently furnishes the occasion for the existence of a confidential relationship.
Id. at 356-57, 467 P.2d 868 (citations omitted).
In Gurenlian v. Gurenlian, 407 Pa.Super. 102, 595 A.2d 145 (1991), the plaintiff-father filed suit to recover a loan made to his son, arguing that their confidential relationship estopped reliance on the statute of limitations as a defense. The court stated that a "confidential relationship" occurs where "one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." Id. at 151-52 (quoting Silver v. Silver, 421 Pa. 533, 219 A.2d 659, 662 (1966)). The court explained that a parent-child relationship alone is insufficient to establish a confidential relationship. More is required, such as dependence on advice and customarily abiding by the child's decisions in similar matters in the past. Finding no additional evidence of reliance, the court upheld the dismissal of the father's claim. Id. at 152.
Groves admits that the existence of a family relationship may under certain circumstances bolster a claim of reasonable reliance on a promise in support of equitable estoppel. However, Groves argues that the record fails to show a "confidential relationship" between Peterson and Groves, nor that Peterson reasonably relied on Groves' alleged promises. We disagree. First, although Peterson was not Groves' biological father, Groves submitted no evidence to contradict Peterson's assertion that their relationship was close and trusting, and that Peterson had raised Groves as a son since Groves was 11 years old. Indeed, Groves stated that he thought of Peterson's loans as a "father's generosity to help his son." More importantly, viewed in a light most favorable to Peterson as the nonmoving party, the record contains evidence and reasonable inferences showing that Peterson relied on Groves in financial and personal matters. Peterson stated that Groves solicited his $128,000 investment in a business venture in which Groves was integrally involved. Groves denies that he solicited Peterson's investment, but admits that he introduced the opportunity to Peterson. It is reasonable to infer that Peterson relied on Groves' advice in deciding to invest a sizeable sum of money in Groves' business venture. Furthermore, the March 1999 letter from Peterson's attorney to Groves indicates that Peterson had given Groves a special power of attorney, but that Peterson had decided to revoke it because of Groves' failure to pay for the notes or to account for Peterson's investment. The fact that Groves had his stepfather's power of attorney is further evidence of a confidential relationship.
Groves flatly denies that he promised to pay the notes upon sale of the land. His credibility in this regard would be for the trier of fact, if we were reversing the order of summary judgment. We observe that the evidence does raise issues as to Groves' credibility. Groves stated that Peterson's lawsuit *898 "came as a complete surprise" despite the March 1999 letter from Peterson's attorney demanding payment. Moreover, Groves' contention that he did not think Peterson would seek to enforce the loans as legal instruments might not be seen as credible by a trier of fact, in light of uncontested evidence that the loans were originally made based on an oral promise to pay, and were later consolidated into two promissory notes payable at 10 percent and 12 percent interest, respectively.
It is true that the statute of limitations lapsed many years before the land sold. No evidence in the record suggests that Peterson was physically or mentally infirm, or that Groves deliberately sought to defraud Peterson. However, the evidence of a confidential relationship, combined with the evidence of Groves' promises to pay upon the happening of a specific event, namely the sale of the land, is sufficient to overcome summary judgment on the issue of equitable estoppel.
However, the analysis does not end there. Most jurisdictions, including Washington, adhere to the rule that estoppel to plead the statute of limitations does not last forever, and that the plaintiff must act within a reasonable time after discovering that the promises relied on were false. Annotation, Plaintiff's Diligence as Affecting his Right to Have Defendant Estopped from Pleading the Statute of Limitations, 44 A.L.R.3d 760, 764. "What constitutes a reasonable time appears to depend upon the exigencies of the particular case." 44 A.L.R.3d at 505, § 5. In Central Heat, Inc. v. Daily Olympian, Inc., 74 Wash.2d 126, 443 P.2d 544, 44 A.L.R.3d 750 (1968), the defendant informed the plaintiff that it would not pay for heat provided during the prior season. The plaintiff delayed filing suit to collect for 2 years and 10 months after the defendant's refusal to pay. The court held that equitable estoppel was available for a reasonable time, but that the action was nevertheless barred by the statute of limitations because the plaintiff had not shown reasonable diligence in bringing suit after the conduct giving rise to the estoppel had terminated. Id. at 134-35, 443 P.2d 544. The court stated:
Facts and circumstances which create an estoppel at one point in time do not justify an unreasonable suspension of the statute of limitations. A party claiming estoppel to prevent an inequitable resort to the statute of limitations may not sleep on his rights.
Id. at 135, 443 P.2d 544. See also Rex v. Warner, 183 Kan. 763, 332 P.2d 572 (1958) (estoppel to plead statute of limitations denied where plaintiff waited 2 years to take legal action after discovering that promise to execute note and second mortgage was false); Ford v. Rogovin, 289 Mass. 549, 194 N.E. 719 (1935) (estoppel denied where final statement relied upon was made within 2 months of accrual of cause of action, and plaintiff delayed 10 months before filing suit); Bryant v. Bryant, 246 S.W.2d 457 (Ky.1952) (estoppel denied where plaintiff failed to file suit during the 6 month period between denial of payment and expiration of limitations period).
However, courts will apply equitable estoppel where there is evidence that the plaintiff exercised due diligence in filing suit after discovering that the promises to perform were false. In Regus v. Schartkoff, 156 Cal.App.2d 382, 319 P.2d 721 (1957), the court held that plaintiff's 2 year delay in commencing suit was reasonable under the facts of that case. The plaintiff, who had reasonably relied on defendant's promises to perform, discovered shortly after the one-year statute of limitations had run that the defendant's promises were false. The plaintiff consulted an attorney and was told that the cause of action was time barred. The plaintiff later commenced action upon advice of another attorney. And in Rapp v. Rapp, 218 Cal. 505, 24 P.2d 161 (1933), the court applied equitable estoppel where the plaintiff filed suit 2 years after the defendant's last written promise to perform, which the plaintiff continued to reasonably rely upon.
In this case, there is no showing that Peterson exercised due diligence in filing suit within a reasonable time after discovering that Groves' promises to pay were false. Peterson knew that the property sold in June 1998. Because the defendants did not receive the proceeds from the sale immediately, Peterson reasonably delayed filing suit until *899 they did receive the proceeds. But the March 1999 letter from Peterson's attorney leaves no doubt that Peterson realized Groves' promises had been false. In the letter, Peterson's attorney demanded payment on the notes within 30 days. He also notified Groves that the special power of attorney had been revoked, requested the return of a gift from the family partnership, and demanded a detailed accounting of an investment Peterson had made in one of Groves' business ventures.
Groves did not pay the notes at the expiration of the 30-day demand period, yet Peterson did not file suit until January 2001, approximately 18 months after the expiration of the 30 days. The record contains no evidence of circumstances that might excuse the delay. Peterson argues that his natural reluctance to sue his stepson should be taken into account, along with his advanced age. Although the record does not indicate Peterson's age, it does show that he married Groves' mother in 1955 when Groves was 11 years old. Thus, Groves was at least 56 years old when Peterson filed the lawsuit, and Peterson no doubt was considerably older than that. But there is no evidence that Peterson is ill or mentally infirm. Natural reluctance to sue a member of the family is indistinguishable from sleeping on one's rights. One either chooses to enforce his rights in court in a timely manner, or he does not, regardless of family relationships.
Because Peterson has not shown due diligence in filing suit after the estoppel period ended, we must affirm the trial court's grant of summary judgment to the defendants.
Groves requested attorney fees and costs on appeal in his responsive brief. However, after oral argument in this case, he filed a document withdrawing his request for fees and costs. Accordingly, we affirm the trial court's order granting summary judgment to the defendants, but do not award attorney fees and costs on appeal.
GROSSE, J., concurs.
COX, J., concurs separately.
NOTES
[1] In the letter, Peterson's attorney also notified James Groves of the revocation of special power of attorney, wherein Bernard Peterson had appointed Groves as his attorney-in-fact and agent. He further asked Groves to reconvey interests in the Peterson Family Partnership gifted to Groves.