# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MARJORIE N. GRAY, by and through her
durable power of attorney agent, JAMES
S. GRAY,

      Appellant,

v.

BROADVIEW DEVELOPMENT
ASSOCIATES II, a Washington limited
partnership, d/b/a IDA CULVER HOUSE
BROADVIEW; BROADVIEW
DEVELOPMENT ASSOCIATES, INC., a
Washington corporation; and ERA LIVING
LLC, a Washington corporation; jointly and
severally liable,

      Respondents.

No. 72715-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 10, 2015

APPELWICK, J. — Gray appeals the summary judgment dismissal of her negligence claims against ICHB. Gray fell while ascending an ICHB bus stairway. The trial court found that as a matter of law the doctrine of implied primary assumption of the risk barred Gray's claims. However, a genuine issue of material fact exists as to whether any assumption of risk was voluntary. Application of the doctrine of implied primary assumption of the risk was error. We reverse and remand.

## FACTS

Ida Culver House Broadview (ICHB) is a retirement community in the Seattle area. ICHB provides a "full continuum of care, including Independent Living, Assisted Living, Memory Care, and Skilled Nursing." To participate in the independent living program, ICHB requires a resident to be "able to participate, physically and mentally, in the activities of daily living" and be "independently mobile within the apartment and physically and

mentally capable of traversing a normal path to safety without the physical assistance of another person."

Marjorie Gray participated in the independent living program at ICHB. In October 2010, Gray was 84 years old. She used a wheeled walker when moving around her room or the facility. At the time, Gray's monthly fees at ICHB were $4,435, which covered room, board, amenities, and services.

The services provided by ICHB included scenic bus tours, which Gray and her husband, Paul,[1] enjoyed. Paul was also an ICHB resident, but was in a wheelchair and participated in the assisted living program. The couple spent time together by taking weekly or biweekly bus tours around the Seattle area. The tours were operated by ICHB staff and the residents were transported on an ICHB community bus.

In 2010, ICHB had two buses. One bus had a single passenger entrance that was a flat platform slightly above ground level. The other bus had two entrances: a lift in the back and a stairway in the front. The stairway had four steep steps.[2] The lift was used for residents in wheelchairs and some residents with walkers. It could raise only one resident at a time. For residents in wheelchairs, the process took about five to seven minutes:

> [T]he operator had to retrieve the remote, unlock the lift from inside the bus, lock the resident in a wheelchair into place on the lift, and accompany the resident on the lift. Then the operator had to unstrap the resident's wheelchair, take the resident into the bus, secure the wheelchair into place by locking down the wheels, and then lower the lift and assist the next resident.

---

[1] We refer to Gray's family members by their first names for clarity's sake. No disrespect is intended.

[2] Gray does not allege that the stairs were defective.

For residents in walkers, the process took about two to four minutes:

> With those residents, the process was to set the walker aside, get on the lift, the operator then closed it on all four sides, and while the resident held onto the siderails [sic], the lift was slowly raised. The operator then opened the rails, assisted the resident to a seat, then returned and lowered the lift.

Typically, between six and ten residents would participate in the scenic tours. Gray's daughter, Paula, witnessed residents boarding the bus many times and rarely saw more than one staff member coordinating the bus loading. Paula never saw a second staff member assisting residents with the stairs while the driver was busy at the lift. According to Paula, the "other residents would be told or motioned to line up by the front entry. Residents with walkers had to set them by the bus doors, and then climb the steps and pull themselves up with the railings without any assistance."

On April 1, 2009, Gray fell and scraped her knees while climbing the stairs of the ICHB bus. Although an ICHB staff member assisted Gray to the bus, Gray did not have assistance climbing the stairs. After Paula was notified of the fall, she spoke to Joanne Kramer, the main nurse in the ICHB Wellness Clinic. Paula asked that the staff use the lift for Gray on future bus outings. Nurse Kramer "assured [Paula] that she would e[-]mail and communicate this to all the recreation staff and bus drivers."[3]

---

[3] Nurse Kramer did not recall speaking to Paula about Gray boarding the bus via the lift. Her statements were presented only in Paula's declaration. Below, ICHB challenged Nurse Kramer's statements to Paula as hearsay. At oral argument on appeal, ICHB asserted that the trial court excluded Nurse Kramer's statements as hearsay. The record does not support this assertion. Nonetheless, we appreciate that, for the purpose of summary judgment review, we may consider only admissible evidence. See Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753, P.2d 517 (1988); CR 56(e). Gray offered Nurse Kramer's statements under ER 801(d)(2)(iv), that provides that a statement is not hearsay if it is offered against a party and was made by the party's agent acting within the scope of the authority to make the statement for the party. Paula's declaration included two promises by Nurse Kramer: that she would e-mail staff about using the lift and that Gray would board the bus only via the lift. Nurse Kramer offered health-related

On July 7, 2010, Gray fell a second time on the ICHB bus stairs. She suffered an abrasion to her right shin, causing a large skin laceration. After the fall, Paula again spoke with Nurse Kramer. According to Paula, Nurse Kramer "put her head in her hands, shook it in frustration, and said: 'I told them to use the lift. I emailed everyone! I'll email them again.' "

In mid-September 2010, Gray suffered a heart attack. ICHB contacted Paula about the incident. Gray was hospitalized for a week.

On October 27, 2010, Gray fell a third time while attempting to climb the ICHB bus stairs unassisted. Gray's skin was fragile, and the fall caused several hematomas on her lower leg. One of the hematomas, which extended from her mid-calf to her ankle, subsequently burst. Gray was in severe pain and her leg required frequent medical treatment over the next three months.

The bus driver that day was ICHB staff member Roseann Tousley. Paula, who watched several bus drivers interact with the residents over the years, observed that Tousley was often brusque and rushed with the residents. Tousley was assisting Paul at the lift when Gray's third fall occurred.

Paula again confronted Nurse Kramer about why Gray had not been boarded onto the bus with the lift. Nurse Kramer "again shook her head and told [Paula] 'I don't know, I don't know. I'd e[-]mailed everyone again after the last fall.' "

---

services to the residents and described herself as a "resource person." However, she did not have authority over the staff members who operated the bus tours. Therefore, the record supports that Nurse Kramer had the authority to promise Paula that she would e-mail staff members about an issue concerning a resident's health, but not to promise Paula that Gray would be boarded using only the lift. Accordingly, Nurse Kramer's promises about e-mailing staff are admissible as statements by the agent of a party opponent.

4

Regarding the incident, Gray stated that she "would NEVER refuse a ride on the lift over taking the stairs." She further stated that sometimes she "would not want to bother the driver to take me on the lift and if they didn't offer, then I just tried taking the stairs. Many times the driver would not offer the lift and I would have to ask, which made me feel like I was imposing." After the third fall, Gray became too afraid to participate in the scenic bus rides with her husband.

On October 23, 2013, Gray sued ICHB for negligence, asserting that ICHB failed to exercise reasonable care in protecting her against the danger posed by the stairs. Gray brought two causes of action: premises liability and common law negligence.

On June 27, 2014, ICHB moved for summary judgment, arguing that Gray assumed the risk of using the stairs. Gray opposed summary judgment, in part because she maintained that there was an issue of material fact as to whether she voluntarily chose to assume the risk of the stairs.

The trial court found that there was evidence to support Gray's argument that ICHB owed a duty to Gray, as a business invitee, to protect her from the stairs. However, it also found as a matter of law that Gray knowingly and voluntarily assumed the risk of the stairs, thus barring any recovery. The trial court granted ICHB's motion for summary judgment on September 4, 2014.

Gray appeals.

DISCUSSION

Gray argues that the trial court erred in granting summary judgment. She alleges that the trial court erred in applying the doctrine of implied primary assumption of risk as a total bar to recovery.

5

We review summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). We consider the evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

To establish a cause of action for negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) damages resulted, and (4) the defendant's breach proximately caused the damages. Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994).

The assumption of risk doctrine traditionally had four classifications: (1) express, (2) implied primary, (3) implied reasonable, and (4) implied unreasonable. Scott v. Pac. W. Mountain Resort, 119 Wn.2d 484, 496, 834 P.2d 6 (1992). Express assumption of risk is not at issue here. Implied primary assumption of risk—the doctrine applied by the trial court—arises when a plaintiff "impliedly consent[s] . . . to relieve [a] defendant of a duty to [the] plaintiff regarding specific known and appreciated risks." Id. at 497 (emphasis omitted). Implied primary assumption of risk operates as a complete bar to recovery. Id. at 499. The two remaining assumption of risk classifications—implied reasonable and implied unreasonable—have been subsumed by comparative negligence, which merely reduces a plaintiff's damages. Id. at 497; Dorr v. Big Creek Wood Prods., Inc., 84 Wn. App. 420, 425, 927 P.2d 1148 (1996).

Because implied primary assumption of risk acts as a complete bar to recovery, courts construe it narrowly. Lascheid v. City of Kennewick, 137 Wn. App. 633, 641, 154

6

P.3d 307 (2007). "Assumption of the risk has experienced a slow but steady fall from grace." ITT Rayonier, Inc. v. Puget Sound Freight Lines, 44 Wn. App. 368, 374-75, 722 P.2d 1310 (1986). For implied primary assumption of risk to apply, a plaintiff must have knowledge of the risk, appreciate and understand its nature, and voluntarily choose to incur it. Erie v. White, 92 Wn. App. 297, 303, 966 P.2d 342 (1998). The plaintiff must have subjective knowledge of not only the risk, but also of an opportunity to act differently, prevent the risk, or proceed on an alternative course. Id. at 304-05. Whether a plaintiff voluntarily encountered the risk turns on whether he or she elected to encounter it despite knowing of a reasonable alternative course of action. Id. at 304. Knowledge and voluntariness are questions of fact for the jury, except if reasonable minds could not differ. Id. at 303. Here, it is clear that Gray had knowledge of the risk. However, the parties dispute whether Gray's choice was truly voluntary.[4]

We view the evidence and reasonable inferences therefrom in a light most favorable to Gray. See Schaaf, 127 Wn.2d at 21. Fairly considered, the evidence demonstrates that using the lift to board a resident was an inconvenient and time-consuming process. Only one resident could be lifted at a time, and the process took two to seven minutes per resident. Usually, between six and ten residents would have to be loaded onto the bus. Rarely did more than one staff member, the bus driver, coordinate the bus loading.

---

[4] Gray pleaded premises liability and ordinary negligence. The trial court's order addressed ICHB's duty to Gray for conditions on the premises. Not addressed is whether the scope of ICHB's duty in providing a transportation service was broader. Given the evidence of Gray's age, physical condition, and history of falls boarding the bus, the scope of duty owed to Gray might have encompassed affirmatively preventing her from accessing the stairs to the bus unattended. Under such a scope of duty, the implied primary assumption of risk doctrine would have no application.

This inconvenience was exacerbated by Tousley's brusque, impatient manner. According to Paula, Tousley appeared exasperated when she had to use the lift, seemed always in a rush, and "would load only 1 or at most 2 residents via the lift." Once, Paula observed Tousley push and lift Paul up the bus stairs, rather than keep him in his wheelchair and use the lift. When Paula questioned Tousley about it, Tousley replied, " 'he's fine' " and continued with what she was doing. Paula described Tousley as a "very intimidating person."

Gray herself stated that she sometimes felt like she was imposing if she asked to use the lift. As a result, if she was not offered the lift, she "just tried taking" the stairs so as not to bother the driver.

Gray also proffered expert testimony to support the assertion that a person in Gray's position would feel too intimidated to ask to use the lift. This testimony came from Alice Semingson, a registered nurse with over 30 years of experience caring for elders. Semingson, who is board certified in gerontological[5] nursing, opined that "Gray's statement is completely consistent with my knowledge of women of her generation, who were often taught to be rule followers. . . . Gray's statement is also, unfortunately, consistent with the feeling many residents in care facilities have about the fear of being a bother and possible retaliation." Semingson stated that "this dynamic [is] well known by those who provide care and services to the elderly."

In sum, Gray, an elderly woman who was hesitant to cause inconvenience, was faced with an intimidating driver who had demonstrated gruffness towards residents and

---

[5] "Gerontology" is the study of the phenomena of, and problems associated with, aging. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 952 (2002).

distaste for using the lift. On this record, the court could not say as a matter of law that Gray voluntarily assumed the risk of using the stairs. We reverse and remand for further proceedings.

WE CONCUR: