# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| UNION BANK, N.A., successor-in-interest to the Federal Deposit Insurance Corporation, as receiver of Frontier Bank, | DIVISION ONE |
| | No. 72805-9-I |
| Respondent, | |
| | PUBLISHED OPINION |
| v. | |
| JOHN T. BLANCHARD and JANE DOE BLANCHARD, husband and wife; RANDY S. PREVIS and KATIE L. PREVIS, husband and wife, | |
| Appellants. | FILED: June 6, 2016 |

DWYER, J. — When Wellington Hills Park, LLC defaulted on a debt owed to Union Bank, Union commenced this action on commercial guaranties executed by John Blanchard, Randy Previs, and Katie Previs (the guarantors) securing that debt. The guarantors asserted numerous affirmative defenses and counterclaims in response, but the trial court concluded that Union was entitled to judgment as a matter of law on its claims and dismissed the guarantors' counterclaims. Because the trial court was correct to enforce the absolute and unconditional guaranties and the guarantors do not establish a genuine issue of material fact with regard to their claims and defenses, we affirm.

I

*A. Blanchard and the Previses give guaranties of borrower's indebtedness to Frontier Bank*

Wellington Hills Park (borrower) is a limited liability company that owned the Wellington Hills Business Campus in Woodinville (the property). Its members are Randy and Katie Previs (85 percent owners), who are long-time real estate investors and developers, and John Blanchard (15 percent owner), "an experienced business and real estate attorney," who also served as borrower's general counsel.

In 2005, borrower obtained a construction loan to develop the property from Frontier. Borrower executed a promissory note evidencing the debt owed to Frontier.[1] The note was secured by a construction deed of trust that encumbered the property and an assignment of rents. It was also secured by individual guaranties executed by Blanchard and each of the Previses (the guaranties).

As part of the loan transaction, Blanchard and the Previses each signed three documents. Specifically, they each signed the note as a member of borrower, signed an individual commercial guaranty, and signed the final loan agreement twice—first as a member of borrower, then as a guarantor.[2]

Borrower defaulted on the note when it came due on January 5, 2010.

*B. Frontier fails and Union buys Frontier's assets from the Federal Deposit Insurance Corporation (FDIC), including the note and guaranties*

On April 30, 2010, the Washington State Department of Financial

---

[1] The original debt principal was $19,500,000 but this amount was increased to $36,700,000 pursuant to a "change in terms" agreement.

[2] Blanchard and the Previses signed similar final loan agreements (called "Notice[s] of Final Agreement") each time the terms of the note changed, as well as when they signed the construction loan commitment letter.

Institutions closed Frontier. The FDIC was appointed as the receiver to liquidate Frontier and wind up its affairs. The same day, Union purchased certain of Frontier's assets from the FDIC, including the note and the guaranties. With respect to the assets it purchased, Union succeeded to the FDIC's rights as Frontier's receiver. The FDIC also authorized Union to avail itself of statutory protections available to the FDIC and its assignees.

The final day to file claims against Frontier with the FDIC was August 4, 2010; neither Blanchard nor the Previses filed claims by that deadline.

C. *The Snohomish County Superior Court appoints a receiver for borrower and the property; Appellants actively oppose the acts of the receiver*

On November 19, 2010, Union filed an application for the appointment of a custodial receiver for borrower and the property in Snohomish County Superior Court (the receivership court).[3] On December 21, 2010, the receivership court entered its order appointing Turnaround Inc. as custodial receiver.

On July 27, 2011, Union moved to convert the custodial receivership to a general receivership. Blanchard and Randy Previs opposed the motion. The receivership court entered an order converting the case to a general receivership and appointing Turnaround as general receiver, which became effective on November 17, 2011.

On December 19, 2011, the receiver gave notice of the deadline to file proofs of claim in the receivership. Blanchard, the Previses, and Randy Previs, as assignee of Veritas Development, Inc. (Veritas),[4] filed claims.

On April 27, 2012, the receiver moved for an order approving a settlement

---

[3] Cause No. 10-2-09992-0.
[4] Veritas is a company formally owned by the Previses' daughter, Ashley Previs.

agreement and release of claims in connection with a soft cost insurance claim previously asserted by borrower. Blanchard and Randy Previs opposed the settlement. On June 1, 2012, the receivership court entered an order approving the settlement agreement and release of claims. In support of its order, the court found "that the [a]greement is fair and equitable, and in the best interests of the estate and its creditors, and that the responses or objections should be over-ruled."

On July 26, 2012, the receiver moved the receivership court for an order to approve bid procedures for the sale of the property. On August 31, 2012, the court granted the motion and entered its bid procedures order.

On January 23, 2013, the receiver gave notice of the successful bidder under the bid procedures order and set a hearing to approve the sale. Blanchard, Randy Previs, and Veritas opposed the proposed sale. On January 31, 2013, the receivership court approved the sale of the property by a purchase and sale agreement between the receiver and OIBP Wellington Hills, LLC (OIBP) for a purchase price of $10,850,000.

On February 8, 2013, Randy Previs and Veritas sought revision of the sale order, but their revision motion was denied. On March 25, 2013, they filed a notice of appeal of the sale order with this court.[5]

Blanchard and the Previses did not post the $7,102,611 bond required to supersede the judgment and stop the sale. Instead, they had borrower declare bankruptcy.

_____

[5] No. 70106-1-I.

-4-

*D. Borrower declares bankruptcy; the bankruptcy court rejects Appellants' opposition and directs the sale of the property*

On August 20, 2013, borrower filed a Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Western District of Washington (the bankruptcy court).[6] The Chapter 7 voluntary petition was signed by Randy Previs, as borrower's managing member.

On September 13, 2013, the Chapter 7 trustee (the trustee) filed a motion requesting that the bankruptcy court approve the sale of the property to OIBP and stating that "assurance and speed of closing" were critical and that "the Trustee cannot ignore the history of the dispute and the decisions made by the Receiver, the tenant, the Bank, the County, the Superior Court and the Court of Appeals."

The trustee also filed his own declaration in support of the sale, stating:

> I have concluded, based on the facts and circumstances of this case, that I should seek Bankruptcy Court approval to sell the Property to OIPB Wellington Hills, LLC, pursuant to essentially the same terms as those agreed to in the state court receivership case. . . . I have determined it is not in the best interest of the estate and its creditors to accept the offer of Veritas and put it before the Court for approval, or to open up this matter to an auction or to a new marketing process.

Veritas and Blanchard filed objections to the trustee's motion. Randy Previs, under the letterhead of Seavestco, Inc., filed an objection both to the trustee's motion and to the receiver's continued control of the property pending its sale. On October 16, 2013, the bankruptcy court granted the trustee's motion, made findings, and entered its order approving the sale of the property.

On October 30, 2013, Veritas filed a notice of appeal from the bankruptcy

---

[6] Case No. 13-17546-KAO.

sale order.

On November 26, 2013, the sale of the property closed and, from the sale proceeds, the closing agent disbursed $9,696,411.88 to Union pursuant to its construction deed of trust.

*E. The bankruptcy court enforces the guaranties and subordinates Appellants' proofs of claim to Union's claim*

Blanchard, the Previses, and Veritas, by Randy Previs as its assignee, filed proofs of claims in the bankruptcy case.

On March 31, 2014, Union moved for summary judgment against Blanchard and the Previses on the ground that the subordination provision in the guaranties subordinated their proofs of claim to Union's claims. In their opposition to the motion, Blanchard and the Previses argued that "Union Bank's conduct in conducting the receivership of Wellington Hills Business Park was substantively unconscionable, rendering the personal guaranties—including the subordination clause—unenforceable."

On May 27, 2014, the bankruptcy court entered summary judgment in favor of Union, upholding the guaranties, enforcing the subordination provisions in the guaranties, and holding that "all distributions on [Appellants'] claims must be paid to Union Bank."

*F. The receivership and bankruptcy case appeals are voluntarily dismissed with prejudice; the cases are closed*

On December 23, 2013, Veritas, borrower, and the trustee agreed to dismiss with prejudice the appeal from the bankruptcy sale order. The appeal was dismissed with prejudice on December 31, 2013. On January 30, 2015, the

bankruptcy court entered its order discharging the trustee and closing the case.

On January 7, 2014, Randy Previs and Veritas moved this court to withdraw its appeal of the sale order of the receivership court. The appeal was dismissed on January 23, 2014. On December 18, 2014, the receivership court entered an order approving the receiver's final report and discharging the receiver.

G. *This action is commenced; Appellants assert affirmative defenses and counterclaims*

On March 29, 2013, while the receivership case was pending and before the bankruptcy case was commenced, Union filed this action for judgment on the guaranties in the King County Superior Court. In response, the guarantors asserted numerous affirmative defenses and counterclaims. On October 10, 2014, the superior court granted summary judgment in favor of Union and against the guarantors, determining that Union was entitled to judgment as a matter of law and dismissing the guarantors' claims with prejudice. On December 9, 2014, after their motion for reconsideration was denied, the guarantors filed the underlying notice of appeal.

II

The guarantors argue that the trial court erred by granting summary judgment to enforce the guaranties. This is so, they assert, because a material dispute of fact exists as to whether the guaranties are void or voidable. They are incorrect.

We review the grant of summary judgment de novo, undertaking the same inquiry as the trial court. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d

1068 (2002). Summary judgment is appropriate only if the supporting materials, viewed in the light most favorable to the nonmoving party, demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); Hartley v. State, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). A "'complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

Union contends that each of the guarantors' claims and defenses is foreclosed by enforcement of the guaranties, together with application of the state statute of frauds and the federal D'Oench[7] doctrine, as codified at 12 U.S.C. § 1823(e). Thus, before addressing the specific assertions made by the guarantors herein, we begin by examining these proposed bases for rejecting the guarantors' claims and defenses.

A

Union asserts that the guaranties are absolute and unconditional promises to pay borrower's debt and that the guarantors waived nearly all claims and defenses to making such payment. We agree.

We recently summarized general principles relevant to the enforceability of absolute and unconditional guaranties.

> "A 'guaranty' 'is a promise to answer for the debt, default, or miscarriage of another person.' 'A contract of guaranty, being a

---

[7] D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp., 315 U.S. 447, 62 S. Ct. 676, 86 L. Ed. 956 (1942).

collateral engagement for the performance of an undertaking of another, imports the existence of two different obligations, one being that of the principal debtor and the other that of the guarantor.'" [Sauter v. Houston Cas. Co., 168 Wn. App. 348, 356, 276 P.3d 358 (2012) (citation omitted) (internal quotation marks omitted) (quoting Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 707, 952 P.2d 590 (1998)).] A guaranty "'is independent'" of the debt, "'and the responsibilities which are imposed by the . . . guaranty differ from those . . . created by the contract to which the guaranty is collateral.'" [Wilson Court Ltd. P'ship, 134 Wn.2d at 707 (quoting Robey v. Walton Lumber Co., 17 Wn.2d 242, 255, 135 P.2d 95 (1943)); accord Freestone Capital Partners, LP v. MKA Real Estate Opportunity Fund I, LLC, 155 Wn. App. 643, 661, 230 P.3d 625 (2010).] "A written guarantee of payment of the principal's indebtedness . . . [is] governed by its own terms." [McAllister v. Pier 67, Inc., 1 Wn. App. 978, 983, 465 P.2d 678 (1970).]

. . . .

"[W]here a guarantor freely and voluntarily guarantees the payment of another, and a creditor relies to its detriment on this guaranty, the law generally requires the guaranty to be enforced." [In re Spokane Concrete Prods., Inc., 126 Wn.2d 269, 278, 892 P.2d 98 (1995).] "'An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice.'" [Century 21 Prods., Inc. v. Glacier Sales, 129 Wn.2d 406, 414, 918 P.2d 168 (1996) (quoting Joe Heaston Tractor & Implement Co. v. Sec. Acceptance Corp., 243 F.2d 196 (10th Cir. 1957)); see also Grayson v. Platis, 95 Wn. App. 824, 826, 978 P.2d 1105 (1999).] "An absolute and unconditional guaranty should be and is enforceable according to its terms. The courts are to enforce it as the parties meant it to be enforced, with full effect given to its contents, and without reading into it terms and conditions on which it is completely silent." [Nat'l Bank of Wash. v. Equity Inv'rs, 81 Wn.2d 886, 919, 506 P.2d 20 (1973).]

Frontier Bank v. Bingo Invs., LLC, 191 Wn. App. 43, 53-54, 361 P.3d 230 (2015)

(some alterations in original).

Just as guaranties may be absolute and unconditional, so may they waive claims and defenses. Waiver provisions in guaranties are uniformly upheld and enforced by Washington courts, including on summary judgment. Old Nat'l Bank

of Wash. v. Seattle Smashers Corp., 36 Wn. App. 688, 691, 676 P.2d 1034 (1984) (upholding waiver of consent of guarantor to grant borrower extension of time because "the language of the guaranty is determinative"); Fruehau Trailer Co. of Canada Ltd. v. Chandler, 67 Wn.2d 704, 709, 409 P.2d 651 (1966) (upholding waiver of defense of release or discharge of principal obligation because "the [relevant] provision of the agreement constituted a full and complete waiver by the guarantors"); Grayson v. Platis, 95 Wn. App. 824, 834, 978 P.2d 1105 (1999) (upholding waivers of right of recourse against lender and of defense based on lender's acceptance of deed in lieu); Columbia Bank, N.A. v. New Cascadia Corp., 37 Wn. App. 737, 739-40, 682 P.2d 966 (1984) (upholding waivers of consent of guarantor to grant borrower extension of time and to release co-guarantor).

There is no dispute as to the language of the guaranties herein at issue. They clearly state that they are absolute and unconditional.

> AMOUNT OF GUARANTY. The amount of this Guaranty is Unlimited.
>
> CONTINUING UNLIMITED GUARANTY. *For good and valuable consideration, [Guarantor] absolutely and unconditionally guarantees and promises to pay* to [Lender] or its order, in legal tender of the United States of America, the Indebtedness . . . of [Borrower] to Lender on the terms and conditions set forth in this Guaranty. Under the Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

(Emphasis added.)

The guaranties also contain clear waiver provisions, which state that the guarantor "waives any and all rights or defenses . . . given to guarantors at law or

-10-

in equity other than actual payment and performance of indebtedness."[8] They also state that the guarantor "waives and agrees not to assert or claim . . . any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right." The guaranties further state that the guarantor "warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that . . . the waivers are reasonable and not contrary to public policy or law."

There can be no serious dispute that the express terms of the guaranties make them unconditional guaranties of payment and waive nearly all counterclaims and defenses, except payment. Accord Frontier Bank, 191 Wn. App. at 54 (so construing a substantially similar guaranty); In re Croney, 2011 WL 1656371 (Bankr. W.D. Wash. May 2, 2011) (same). Accordingly, if the guaranties herein are enforceable, the only defense remaining to the guarantors would be actual payment (which they do not assert). Furthermore, because the promissory notes that these guaranties support are delinquent, the obligations of the guarantors would also be delinquent.

### B

Union also asserts that the state statute of frauds operates to foreclose some of the guarantors' claims and defenses. We agree.

Washington's statute of frauds bars the enforcement of credit agreements that are not in writing:

---

[8] This specifically includes: "any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness."

A credit agreement is not enforceable against the creditor *unless the agreement is in writing and signed by the creditor.* The rights and obligations of the parties to a credit agreement *shall be determined solely from the written agreement,* and any prior or contemporaneous oral agreements between the parties are superseded by, merged into, and may not vary the credit agreement. Partial performance of a credit agreement does not remove the agreement from the operation of this section.

RCW 19.36.110 (emphasis added).

A "credit agreement" is defined as:

an agreement, promise, or commitment to lend money, to otherwise extend credit, to forbear with respect to the repayment of any debt or the exercise of any remedy, to modify or amend the terms under which the creditor has lent money or otherwise extended credit, to release any guarantor . . . , or to make any other financial accommodation pertaining to a debt or other extension of credit.

RCW 19.36.100.

Herein, the guarantors assert that Frontier made them various promises to extend them further credit, including by giving them a "mini-perm" loan[9] in 2009, when it appeared as if borrower would be unable to continue making payments due on the loan. In support of this assertion, the guarantors point to multiple "risk assessment report[s]" by Frontier, some of which acknowledge the possibility that borrower will need additional credit in order to stay current on loan payments, and a "loan memorandum," which appears to be an application for the mini-perm loan in question. As an initial matter, none of these documents actually includes a promise to extend credit. More to the point, none is signed by a Frontier

---

[9] A mini-perm loan is a temporary loan issued by banks as bridge funding for a development loan from construction to tenancy.

representative.[10] Therefore, the guarantors' reliance on these documents is barred as proof of the purported promises by the statute of frauds.

There is no documentary evidence of the existence of any credit agreement between Frontier or Union and the guarantors, aside from the undisputed loan agreements, promissory note, and guaranties at the heart of the controversy, whose existence and terms are undisputed.

C

Union also asserts that application of the federal D'Oench doctrine further limits the claims and defenses available to the guarantors. We agree.

> "The federal D'Oench doctrine prohibits a party from asserting a cause of action against the FDIC *or its assignees* based upon unwritten agreements or other schemes alleged to be entered into by a failed bank. Langley v. [Fed. Deposit Ins. Corp.], 484 U.S. 86, 92–93, 108 S. Ct. 396, 98 L. Ed. 2d 340 (1987). In D'Oench [,] Duhme & Co. v. FDIC, 315 U.S. 447, 62 S. Ct. 676, 86 L. Ed. 956 (1942), the United States Supreme Court enunciated this doctrine, which is intended to protect the FDIC *and its assignees* from fraudulent schemes by borrowers of failed institutions. The doctrine also protects the FDIC by allowing bank representatives to rely solely on the records of the bank in evaluating the bank's financial condition, rather than leaving it exposed to suits founded on undisclosed conditions or deceptive documents. [Fed. Deposit Ins. Corp.] v. Zook Bros. Constr. Co., 973 F.2d 1448, 1450–51 (9th Cir. 1992)."

Frontier Bank, 191 Wn. App. at 63-64 (emphasis added) (alterations in original) (quoting Kanany v. Union Bank, N.A., No. C11–6062 RJB, 2012 WL 5258847, at *5 (W.D. Wash. Oct. 24, 2012)); accord Nw. Land & Inv., Inc. v. New W. Fed. Sav. & Loan Ass'n, 64 Wn. App. 938, 943, 827 P.2d 334 (1992) (The D'Oench doctrine "bars a borrower from asserting . . . any claim or defense based on any

---

[10] The guarantors assert that one of these reports was signed by three representatives of Frontier. In fact, the worksheet to which they refer is separate from any report that mentions the "mini-perm" in any way.

unrecorded agreement which alters the terms of a seemingly unqualified obligation to pay").

The D'Oench doctrine was codified at 12 U.S.C. § 1823(e), as part of the Federal Deposit Insurance Act. That provision provides, in pertinent part:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
> (A) is in *writing*,
> (B) was executed by the depository institution *and* any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
> (C) was *approved by the board of directors of the depository institution or its loan committee*, which approval shall be reflected in the minutes of said board or committee, and
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1) (emphasis added).

Contracts that do not meet these requirements "cannot be enforced even when a bank fraudulently induces a customer with oral misrepresentations, or when a customer is completely innocent." Nw. Land, 64 Wn. App. at 943; accord Langley, 484 U.S. at 93 ("We conclude . . . that neither fraud in the inducement nor knowledge by the FDIC is relevant to the section's application. No conceivable reading of the word 'agreement' in § 1823(e) could cause it to cover a representation or warranty that is bona fide but to exclude one that is fraudulent."); Frontier Bank, 191 Wn. App. at 66-67 (applying Langley).

Responding to the perceived unfairness of this result, the Supreme Court stated:

> The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement

that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. It would be rewriting the statute to hold otherwise.

Langley, 484 U.S. at 95.

The FDIC authorized Union to avail itself of the protections provided pursuant to this statute,[11] and Union does so herein.

The application of this statute to the guarantors' affirmative defenses is similar to our application of the state credit agreements statute of frauds. That is, the federal statute, for largely the same reasons, bars consideration of the documents upon which the guarantors primarily rely.[12] However, the federal statute is independently relevant. For one, the circumstances herein are the precise target of the law, which was meant to protect purchasers of FDIC assets acquired from failing financial institutions. Moreover, prior applications of this law to analogous circumstances make clear that not even fraud on the part of the failed financial institution—coupled with knowledge on the part of the acquiring institution—removes an alleged credit agreement from the statute's technical requirements.

Thus, the guarantors' argument regarding separate financial arrangements made with Frontier are foreclosed by state and federal laws that

---

[11] While the guarantors attempt to cast doubt upon this fact (Blanchard stated, for example, "Randy Previs and I were left completely out of th[e] process [of obtaining the FDIC's permission], and to this day I have no idea how the Union Bank consent request was worded or what information it contained. . . . I am in the dark about that."), the only relevant record evidence indicates that Union obtained the required permission from the FDIC.

[12] As for the signed worksheet upon which the guarantors seek to rely, because it was signed by only Frontier, even if—contrary to our conclusion—it were to pass muster under the state statute, it would nevertheless fall short under the federal statute. Indeed, Blanchard acknowledged as much in a declaration submitted to the trial court, which stated, in pertinent part, "our arrangements with Frontier Bank may not meet all of the strict (unrealistic and unfair) standards of D'Oench."

require such agreements to comply with certain technical requirements.

We turn now to the propriety of the trial court's order on summary judgment.

D

The guarantors raise a number of claims and defenses to Union's action on the guaranties. These can be generalized into three categories: fraudulent inducement to enter into the guaranties, fraudulent inducement to contribute additional funds to the property development project, and misconduct by Union after acquiring the guaranties, particularly in the course of the receivership and bankruptcy proceedings.

i

*Fraud in the inducement by Frontier – the guaranties:* The guarantors first contend that they were fraudulently induced to sign the guaranties by representations made by Frontier that, if necessary, it would extend borrower further credit to fund the project through tenancy. This contention fails for several reasons.

Initially, the guarantors' claim relies on alleged unwritten credit agreements. Accordingly, it is barred by the state statute of frauds and the federal D'Oench doctrine.

Furthermore, even were we to consider the guarantors' allegations, their claim would nevertheless fail because they did not properly plead it or offer sufficient evidence in support thereof to withstand summary judgment.

> Fraud must be pleaded with particularity. CR 9(b). Particularity requires that the pleading apprise the defendant of the facts that

-16-

give rise to the allegation of fraud. See Pedersen v. Bibioff, 64 Wn. App. 710, 721, 828 P.2d 1113 (1992); Harstad v. Frol, 41 Wn. App. 294, 301–02, 704 P.2d 638 (1985). . . .

> The elements of fraud include
> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

Adams v. King County, 164 Wn.2d 640, 662, 192 P.3d 891 (2008).

The guarantors' claim falls critically short because they did not plead or offer evidence that, even if a representation was made regarding future credit agreements, it was false when made and made with knowledge of its falsity.[13]

ii

*Fraud in the inducement by Frontier – additional contributions:* The guarantors assert that they were induced to make additional financial contributions to the property development project by Frontier's fraudulent promises to extend them further credit in exchange for their payments. At the outset, this contention fails for the same reason as did the fraudulent inducement claim—that is, because it relies on unsigned credit agreements, it is barred by the state statute of frauds and the federal D'Oench doctrine.

In addition, the guarantors failed to properly plead or offer sufficient

---

[13] The guarantors also obliquely contend that they were fraudulently induced to enter into the guaranties because Frontier was likely already in financial trouble at the time they agreed to them. Specifically, in their opening brief, the guarantors state, "Appellants believe it is likely that Frontier Bank was 'in trouble' financially and not in compliance with applicable bank regulations at the time the original Wellington Construction Loan (and Appellants signed the Guaranty) was made." Br. of Appellant at 21. This iteration of the fraudulent inducement claim also suffers from poor pleading and insufficient proof. The guarantors do not establish, among other things, a relevant "representation."

evidence in support of their claim. Specifically, assuming that Frontier did promise to extend further credit, they did not plead (and offered no evidence that) the maker of this promise knew it to be false at the time made. Instead, the guarantors repeatedly assert that Frontier reneged on the promise. This is insufficient.

Finally, this particular fraudulent inducement claim also fails because it is unrelated to the guarantors' decisions to enter into the guaranties. Even were we to assume the veracity of the guarantor's contentions, they would not cast light on the validity of the guaranty. Because it does not undermine the validity of the guaranties, this claim falls into the set of claims and defenses that were waived in the guaranties.

### iii

*Misconduct by Union after procuring the guaranties:* The guarantors also assert claims of misconduct by Union. Their first contention is that Union, through actions taken in the receivership and bankruptcy cases, impaired the value of the loan collateral (i.e., the property). They also contend that Union did not work in good faith with them to sell the property for the highest price.[14]

Initially, all of the guarantors' claims with respect to Union are barred by the terms of the guaranties. Having determined that the guaranties are enforceable despite the fraud alleged by the guarantors, it follows that the waiver provisions apply. Pursuant to these provisions, the guarantors waived claims and defenses to nonpayment, including those asserted herein.

---

[14] See Reply Brief of Appellant at 20 ("[T]he ultimate and most egregious bad faith in this matter is Union Bank's repeated refusal to even look at multiple opportunities to realize millions of dollars more for [the property].").

The argument regarding Union's alleged misconduct in the receivership and bankruptcy cases suffers from two additional critical flaws. First, the guarantors incorrectly attribute decisions that were made by the receiver or the trustee to Union. To the extent that the guarantors mean, literally, that the actions in question were taken by Union, they simply misstate the record. However, their argument seems to be that, although Union did not literally make the decisions in question, those decisions are nevertheless attributable to Union. The attribution is based, we assume, on an unspecified principal-agent relationship. This argument is nothing more than speculation and, therefore, fails.

The argument also overlooks the role of the court in the allegedly improper actions. A receiver is "a person appointed by the court as the court's agent, and subject to the court's direction, to take possession of, manage, or dispose of property of a person." RCW 7.60.005(10). The power to appoint a receiver is within the trial court's discretion. King County Dep't of Cmty. & Human Servs. v. Nw. Defenders Ass'n, 118 Wn. App. 117, 122, 75 P.3d 583 (2003). Likewise, a trustee in bankruptcy is an officer of the court. In re Castillo, 297 F.3d 940, 946 (9th Cir. 2002); accord Leonard v. Vrooman, 383 F.2d 556, 560 (9th Cir. 1967) (noting that a trustee in bankruptcy is an officer of the court and is not subject to suit without leave of the appointing court for acts done in his official capacity and within his authority); Vass v. Conron Bros. Co., 59 F.2d 969, 970 (2d Cir. 1932) (holding that a bankruptcy trustee, like a receiver, is an officer of the court, and trustee's possession is protected because it is the court's). At the time of the

alleged misconduct by the receiver and the trustee, they were subject to the continuing authority of the court, which ratified each of the challenged decisions. The guarantors were clearly dissatisfied by the result of those proceedings, but they may not make them the subject of this action by incorrectly attributing them to the only other party appearing in the caption.[15]

The guarantors also assert that Union violated a duty of good faith to them by refusing to consider alternate arrangements for extracting value from the property.

> "'[A]n implied duty of good faith and fair dealing [is] imposed on the parties to a contract.'" [Miller v. U.S. Bank of Wash., N.A., 72 Wn. App. 416, 425, 865 P.2d 536 (1994) (quoting Betchard–Clayton, Inc. v. King, 41 Wn. App. 887, 890, 707 P.2d 1361 (1985)).] With guaranties, "the creditor's [implied] covenant of good faith is to diligently pursue collection of the debt, and the guarantor may be relieved of liability on the debt where the creditor does not exercise due diligence in collection of that debt." [Id.]
> But this court has "specifically limited claims by guarantors against lenders, including breach of good faith claims, to performance of specific contract terms." [Grayson, 95 Wn. App. at 833]. Absolute guarantors lack "'any recourse against the lender unless it is alleged **and proved** that the lender acted in bad faith.'" [Id. at 831 (emphasis added) (quoting Nat'l Bank of Wash., 81 Wn.2d at 920).] As previously stated, this court has held that "'a guarantor cannot rely upon the relationship between a lender and a

---

[15] The guarantors' claims regarding actions taken in the receivership and bankruptcy cases also fail because they actively participated in those proceedings by, among other things, filing proofs of claim and opposing any sale of the property.

RCW 7.60.190, entitled, "Participation of creditors and parties in interest in receivership proceeding-Effect of court orders on nonparties," provides that creditors and parties who receive notice, have actual knowledge of, and actively participate in receivership proceedings are bound by the acts of the receiver and the order of the receivership court, regardless of whether they are formally joined as parties. The same principles apply to acts of the bankruptcy trustee and orders of the bankruptcy court. Langenkamp v. Culp, 498 U.S. 42, 45, 111 S. Ct. 330, 112 L. Ed. 2d 343 (1990) (by filing a proof of claim, one submits himself to the jurisdiction of the bankruptcy court); In re Farmland Indus., Inc., 376 B.R. 718, 727 (Bankr. W.D. Mo. 2007) (bankruptcy court sales order is binding on entity that participated in bankruptcy case sale motion and that entity cannot, in another lawsuit, challenge the sale as improper).

Because the guarantors filed proofs of claim in both the receivership and the bankruptcy cases and because they contested both attempts to obtain authorization to sell the property, they are bound by the actions taken in each case and cannot challenge them here.

borrower to create a fiduciary duty running from the lender to the guarantor.'" [Id. at 833 (quoting Miller, 72 Wn. App. at 426).]

Frontier Bank, 191 Wn. App. at 70 (first alteration in original).

In sum, the common law duty of good faith does not require Union to refrain from its rights under the guaranties, as it properly does here. See GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 150, 317 P.3d 1074, review denied, 181 Wn.2d 1008 (2014).

Because the guarantors' claims and defenses fail as a matter of law, the trial court's order granting summary judgment in Union's favor as to its claims pursuant to the guaranties was proper.

III

Union requests attorney fees on appeal based on the terms of the guaranties.

In Washington, attorney fees may be awarded for costs of litigation only when authorized by contract, statute, or recognized ground of equity. Durland v. San Juan County, 182 Wn.2d 55, 76, 340 P.3d 191 (2014).

Herein, the guaranties state, "Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. . . . Costs and expenses include Lender's attorneys' fees and legal expenses . . . for . . . appeals." Because Union has established a right to the enforcement of the guaranties, it is entitled to an award of reasonable attorney fees on appeal.

Accordingly, upon compliance with RAP 18.1, a commissioner of this court will enter an appropriate order.

Affirmed.

We concur: