[Nos. 26233-5-I; 26248-3-I;   Division One.   March 23, 1992.]
26497-4-I.

RUBY PEDERSEN, ET AL, *as Personal Representatives, Respondents,* v. JAMES D. BIBIOFF, ET AL, *Appellants.*

*Michael P. Ruark* and *Inslee, Best, Doezie & Ryder P.S.*; *R. Scott Hutchison* and *Hutchison & Foster*, for appellants.

*James L. White, Kathryn Jenkins,* and *William Weir,* for respondents.

SCHOLFIELD, J. — Respondents Ruby Pedersen and Linda Bibioff,[1] as copersonal representatives of the Estate of John Bibioff, brought this suit against James Bibioff, Lawyers Title Company of Washington, and City Bank, seeking to quiet title to certain realty in the estate of John Bibioff. From a judgment quieting title to the realty in the estate, James Bibioff and City Bank appeal. We affirm.

## FACTS

This case concerns the validity of a claim that the decedent John Bibioff made an inter vivos transfer by deed of his home to his son James Bibioff. The following facts were established at trial:

The decedent, John Bibioff, was a man of Russian heritage whose ability to speak and read English was limited. He was an upholsterer by trade and had operated his own upholstery business for several years before retiring. Through a previous marriage to Catherine Bibioff, John Bibioff had two sons: James Bibioff, who was adopted as an infant, and Bill Bibioff. During their marriage, John and Catherine purchased and sold several homes, and in the early 1950's, they purchased the north Seattle home that is in dispute in this case. After their divorce in the 1960's, Catherine deeded the property to John Bibioff, and John resided in the home until his death.

Although very intelligent and good with figures, John Bibioff was very limited in his ability to write, read or comprehend written English. He always made his own business decisions and was a good businessman, but he did rely on others to read certain things to him. He would often have one person read him a document, and then have another person read him the same document in order to verify what the first person had told him. The trial court found that John Bibioff had a strong personality, was at all times mentally competent to handle his own affairs, and that he had made his own decisions.

---

[1] The name "Pedersen" is used throughout this opinion interchangeably to refer to either Ruby Pedersen, individually, or to Ruby Pedersen and Linda Bibioff, as corepresentatives.

Between 1971 and January 1987, James Bibioff lived with his father off and on at his father's north Seattle home. James had a son, Dale Bibioff, from his first marriage, and a daughter, Tanya Bibioff, from his second marriage.[2] The last continuous period James lived with his father was from the early 1980's until 1987. John and James Bibioff had a normal father-son relationship and exchanged advice from time to time.

After his retirement, John Bibioff supported himself primarily on Social Security and a small amount of savings and certificates of deposit. He managed his own personal and financial affairs right up to the time of his death, but sought help from friends and family to pay his bills. He would ask his ex-daughter-in-law Linda Bibioff, friends including Ruby Pedersen and others, or his son James to fill out the checks he used to pay his bills and then he would sign them himself.

In October 1974, John Bibioff executed a will devising his estate in three equal shares to his son James, his granddaughter Tanya, and his grandson Dale. In 1985, John desired to revise his will and discussed his testamentary intentions with his friend Ruby Pedersen. Pedersen testified that John's plan was to cut out his grandson Dale, because Dale had "kind of gotten in with the wrong crowd . . .". Dale's one-third share would then go to Tanya, with the resulting distribution being one-third to James and two-thirds to Tanya.

In the spring of 1985, while John and James Bibioff were getting their hair cut at the salon of James' ex-wife Sandy, they ran into attorney James Krider, who had previously represented Sandy in her divorce from James. James Bibioff personally knew Krider. John and James subsequently made an appointment to meet with Krider to prepare their respec-

---

[2]James Bibioff's first marriage was to Carole Curnew sometime during the 1960's. His second marriage was to Linda Bibioff and lasted from 1966 to 1973. Linda Bibioff is a copersonal representative in this action and is the mother of Tanya Bibioff. His third marriage was to Sandra Dillard and lasted from 1978 to 1980.

tive estate planning documents. At that time, however, Krider was winding up his law practice, which he shared with fellow attorney Mary Jarvis. By the time of John's and James' July 2, 1985, appointment, Krider was no longer with the office. Thus, John and James met with Jarvis, an attorney neither had previously met.

The trial court found no credible evidence as to what discussions took place during the July 2 meeting, which lasted in excess of 1 hour 15 minutes. The result of the meeting, however, was that John and James both executed wills naming the other as the sole beneficiary of their estates. At the same time, John and James both signed quitclaim deeds by which they deeded John's north Seattle home to each other. Jarvis kept the quitclaim deed from John to James, but James retained the quitclaim deed from himself back to his father.

In the spring of 1986, James and his girl friend began spending occasional evenings at John's north Seattle home. By that fall, John Bibioff had expressed to friends his displeasure with the presence of James' girl friend at his house and how the situation interfered with his activities. In October 1986, John and James had an argument about James' girl friend living at the house, and James purportedly told John that he would throw him out because he, James, owned the house. John's friend, Ruby Pedersen, testified that John thereafter asked for her help in finding out if James really did own the house. Pedersen testified that John wanted her to read him the will because he had never had a chance to read it. On discovering the contents of the will, Pedersen testified that John was in a state of amazement and disbelief, stating, " 'That isn't what I wanted' ".[3] Pedersen stated that John had wanted the distribution to be "a third and two-thirds". John then had Pedersen contact John's attorney, Victor Hoff, to revise the will.

In October 1986, John Bibioff met with attorney Victor Hoff for the purpose of changing his will. Ruby Pedersen

---

[3]The trial court admitted this evidence as an excited utterance. ER 803(a)(2).

accompanied John to his meeting with Hoff. John's intent was to redraft his will so as to leave two-thirds of his estate to his granddaughter Tanya and one-third to his son James, and the will was so revised.[4]

During the course of this meeting, Ruby Pedersen stated that she had heard something about James Bibioff having a deed to his father's house.[5] Hoff then went over the issue with John Bibioff in some length. The matter was discussed several times, with John adamantly denying that he had deeded the home to his son or anyone else. Hoff testified that John made absolutely clear that he had not signed any deed and that it was not necessary to check and see if any deed had been recorded. Linda Bibioff apparently checked the records of the King County Auditor, but could find no quitclaim deed recorded.

At the end of January 1987, Linda Bibioff and Ruby Pedersen accompanied John Bibioff to the offices of Linda's attorney, Jay DeMers, to have John's will reviewed by DeMers. The possibility that a quitclaim deed had been executed was discussed with DeMers. Pedersen testified that at the time, she and Linda did not know for sure whether such a deed was outstanding.

On February 2, 1987, John Bibioff received a letter from the King County assessor's office advising him that because he had conveyed his property, he was no longer entitled to the senior citizen discount. Ruby Pedersen and another of John's friends, Jack Bulger, met with John shortly after his receipt of the letter. Jack Bulger immediately contacted the assessor's office for more information and was informed that the house was no longer in John's name, but was in the

---

[4]Evidence as to John Bibioff's intent in drafting the will was admitted over objection by defendants. The court allowed the evidence to show why John sought to have the new will prepared.

[5]James Bibioff had mentioned the quitclaim deed to Pedersen while the two were having dinner at a restaurant in the summer of 1986. Pedersen testified that James had stated, " 'We got the old man' ". When Pedersen asked what he meant, James purportedly replied, " 'Oh, we got him to sign a quitclaim deed, and he didn't even know what he was signing.' "

name of his son James, and that a quitclaim deed had been recorded.[6] Pedersen testified that John Bibioff was hysterical on learning the news. "He was banging his hand on the table, and tears in his eyes, and just saying, 'I didn't. I didn't. I didn't sign. I just signed a will. I just signed a will.' "[7]

On February 17, 1987, John Bibioff executed new estate documents disinheriting his son James Bibioff. John's attorney, Jay DeMers, contacted Mary Jarvis, the attorney who had been present when the quitclaim deed was executed on July 2, 1985. DeMers explained to Jarvis that John Bibioff was upset and desired that his home be returned immediately. After his discussion with Mary Jarvis, DeMers was not satisfied that John had intended to convey his home to James.

City Bank contends that in April 1987, James Bibioff applied for a line of credit and offered a deed of trust on the disputed property as security for the loan. City Bank obtained a title report confirming that James Bibioff owned the home, and on May 11, 1987, City Bank granted James Bibioff a line of credit for $50,000, secured by a deed of trust on the disputed property. By November 5, 1987, City Bank contends that it had advanced the full $50,000 to James Bibioff. City Bank argues that it had no knowledge of any interest of John Bibioff in the property.

John Bibioff died in October 1987. In January 1988, plaintiffs Ruby Pedersen and Linda Bibioff, copersonal representatives of the estate of John Bibioff, brought this suit against defendants James Bibioff, Lawyers Title Company of Washington, and City Bank. Plaintiffs generally sought to quiet title to the disputed property in the estate of John Bibioff, and further sought to have City Bank's security interest in the property declared void. Plaintiffs also

---

[6]James Bibioff testified that he did not record the quitclaim deed immediately after its execution in July 1985, because he was involved in some litigation at the time. He ultimately recorded the deed on November 25, 1986.

[7]Defendants made no hearsay objection to this evidence.

sought the impression of a constructive trust on the property in their favor for the benefit of Tanya Bibioff.

In their complaint, plaintiffs characterized the nature of their claim as follows:

> The Quitclaim Deed ostensibly by and between the late John William Bibioff, Grantor and his adopted son Defendant James D. Bibioff, Grantee was caused to be executed by the late John William Bibioff by fraud, deceit, artifice and undue influence of Defendant James D. Bibioff in breach of the fiduciary relationship between them; is nonconsensual and therefore void.

The defendants filed a motion in limine to exclude certain out-of-court statements made by the decedent John Bibioff. The defendants also moved to exclude evidence pertaining to James Bibioff's prior actions as personal representative of his mother's estate. The record does not contain the court's rulings on these motions.

A bench trial was held in March 1990. The court decided to bifurcate the issues to be tried, determining first whether the quitclaim deed was void. Once that determination was made, the issue of City Bank's interest in the property would be addressed, if necessary.

On April 23, 1990, the court entered findings of fact and conclusions of law. The court concluded that, at the time of the July 2, 1985, transfer of the quitclaim deed from John Bibioff to James Bibioff, a confidential relationship had existed between the two. This resulted in a shift of the burden to James Bibioff to establish that the deed had not been obtained through fraud or undue influence, and the court determined that James had failed to carry this burden. The court therefore concluded that the deed was void as between John and James Bibioff. Title to the disputed property was thus quieted in the estate of John Bibioff, subject to the deed of trust of City Bank, if City Bank could establish that it was a bona fide purchaser. The court subsequently entered summary judgment in favor of plaintiffs on City Bank's claim, ruling that its prior finding of fraud in factum rendered the deed void ab initio.

This appeal followed.

CONFIDENTIAL RELATIONSHIP

James Bibioff and City Bank argue that although the findings of fact are supported by substantial evidence, those facts do not support the conclusion that a confidential relationship existed between James and John Bibioff. James argues that there is no finding that he had gained his father's confidence or advised him as to his best interests, nor is there any finding that John was dependent upon him for support or maintenance. James argues that the lack of such findings renders the conclusion of a confidential relationship erroneous.

██ As a general rule, one seeking to set aside an inter vivos gift has the burden of showing the invalidity thereof. *Lewis v. Estate of Lewis*, 45 Wn. App. 387, 725 P.2d 644 (1986). However, if the donor and donee share a confidential relationship, the burden shifts to the donee to prove that the gift was intended and was not the product of undue influence. *Lewis*, at 389. While parentage alone does not necessarily establish a confidential relationship between parent and child, the fact of parentage frequently furnishes the occasion for the existence of a confidential relationship. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 357, 467 P.2d 868, *review denied*, 78 Wn.2d 993 (1970).

> This is true when the parent may become dependent upon the child, either for support and maintenance, or for care or protection in business matters as well, or for both, and the child, by virtue of factors of personality and superior knowledge and the assumption of the role of adviser accepted by the parent, may acquire a status, *vis-a-vis* the parent, that will bring about the confidential relationship.

*McCutcheon*, at 357.

The trial court did not include specific factual findings in support of its conclusion that a confidential relationship existed. In the absence of such findings, this court may look to the oral opinion to determine the basis for the trial court's resolution of the issue. *In re Marriage of Griffin*, 114 Wn.2d 772, 777, 791 P.2d 519 (1990). The trial court here listed several factors in its oral opinion to support its conclusion:

I had previously found that the plaintiffs had made out a prima facie case in that regard [confidential relationship status], thus shifting the burden to the defense. The factors that are important, I think, are that this was, of course, a father-son relationship, and they were living together. John was, well, the term "functionally illiterate" has been used. I don't know that it's quite that extreme, but certainly John was handicapped in many fashions, and required the assistance of his group of friends and, of course, Jim to handle his daily affairs and the daily necessaries. Checks were written by Jim. I think it is quite clear that John at the point in time we're speaking of did trust and rely on Jim. So I will, therefore, find that a confidential relationship existed.

This finding is supported by substantial evidence. Unable to read, write or understand written English, John relied on others, including his son James, to pay bills and interpret letters and documents. There was testimony that the relationship between John and James was characterized by complete trust, love and devotion. John was very hard of hearing and could not conduct ordinary conversation over the telephone. James lived with John for several years prior to John's death, and there was testimony that John relied on and trusted James to assist him in paying bills and taking care of business matters. This living arrangement, combined with James' superior knowledge of the written English language, placed James in a natural position to advise his father regarding many day-to-day affairs. The evidence indicated that James acted in such a capacity.

James Bibioff points out several findings he contends are inconsistent with the finding of a confidential relationship. These include findings that John Bibioff was at all times mentally competent and possessed of a strong personality, that he made his own decisions, and that he was competent to handle his own affairs. James contends that in *Lewis*, 45 Wn. App. at 390, this court found on similar facts that no confidential relationship existed between a mother and her son.[8]

---

[8]In *Lewis*, the petitioner (Mrs. Lewis) had made an inter vivos gift of land to her son Bill. *Lewis*, at 388. After Bill's death, Mrs. Lewis sought to have the gift

The facts of *Lewis* are similar to this case. The crucial distinction, however, is that the petitioner in *Lewis* was able to read and write, *Lewis*, at 390, whereas in this case John Bibioff could not comprehend written English. John Bibioff may well have been competent to make his own decisions, but he based these decisions on the information relayed to him by James and others. The nature of his reliance on others is sufficient to distinguish this case from *Lewis*. Substantial evidence supports the trial court's conclusion that a confidential relationship existed.

## UNDUE INFLUENCE

A conclusion that John and James Bibioff shared a confidential relationship shifts the burden to the donee, James, to prove that the gift was not the product of undue influence. *Lewis*, at 389. This imposes a heavy burden, as the existence of undue influence between persons in a confidential relationship is more readily inferred. *McCutcheon*, 2 Wn. App. at 357. The donee must present clear, cogent and convincing evidence that a gift was intended. *McCutcheon*, at 357.

The existence of undue influence is a factual question. *McCutcheon*, at 356. In an attempt to prove that John Bibioff intended a gift of his home to James, appellants point to evidence from the record and the trial court findings that John was intelligent and competent, made his own decisions, and had a strong will. While this evidence does indicate that James did not pressure or coerce John into making the gift, it does not necessarily establish that a knowing

---

set aside on grounds of undue influence. *Lewis*, at 388-90. The trial court found that no confidential relationship had existed between Mrs. Lewis and her son. *Lewis*, at 389. This court affirmed on the basis of several factors. Although Mrs. Lewis had lived with Bill from 1947 to 1982 and Bill had assisted her financially, Mrs. Lewis had at no time depended upon Bill to make decisions for her. *Lewis*, at 390. Mrs. Lewis was fully competent at the time of the transfer and not suffering from any physical or mental disability. Her hearing was impaired, but adequate, and she was able to read and write. Furthermore, she did not rely on Bill or any of her children to make decisions for her. *Lewis*, at 390.

and voluntary transfer occurred. If a confidential relation-ship exists, evidence to sustain the gift

> must show that the gift was made *freely, voluntarily, and with a full understanding of the facts* . . . If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected.

(Italics ours.) *McCutcheon*, at 356 (quoting 38 Am. Jur. 2d *Gifts* § 106 (1968)).

The trial court here found that John Bibioff had no intent to convey his property to James Bibioff and did not know-ingly do so. This finding is not inconsistent with a finding that John Bibioff was intelligent, competent and possessed of a strong will. The evidence indicates that John Bibioff signed a deed without understanding the consequences of the act, at a time when he did not intend to transfer owner-ship of his home. This is sufficient to defeat an alleged gift between persons in a confidential relationship, even though evidence of coercion may be lacking. *See McCutcheon v. Brownfield, supra.* James Bibioff failed to produce clear, cogent and convincing evidence that a gift was intended.

### FRAUD IN FACTUM

■ James Bibioff and City Bank next contend that Peder-sen failed to allege fraud in factum with sufficient par-ticularity. CR 9(b) provides in part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." However, it is not necessary under this rule that the word "fraud" be used in the complaint, as long as facts are pleaded sufficient to present the question of fraud. *Harstad v. Frol*, 41 Wn. App. 294, 301, 704 P.2d 638 (1985). In this case, Pedersen did use the term "fraud" in the complaint and apprised appellants of the transaction in which fraud was alleged. Pedersen clearly contended that the deed was nonconsensual and void.[9] This was sufficient to satisfy the requirements of CR 9(b).

---

[9]At the beginning of the second day of the trial, respondents requested that the trial be bifurcated with the first issue decided being whether the deed was

Bibioff and City Bank next argue that Pedersen failed to prove fraud in factum. They argue that Pedersen fell far short of establishing the nine elements of fraud by clear, cogent and convincing evidence. The trial court's findings, Bibioff and City Bank contend, are insufficient to support its conclusion of fraud in factum.

■ ■ Fraud in factum, also referred to as fraud in the execution, has been defined as fraud that goes to the nature of the instrument itself. *See Adair v. Hustace*, 64 Hawaii 314, 320 n.4, 640 P.2d 294, 299 (1982). The Restatement (Second) of Contracts provides the following definition of fraud in the execution:

> If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.

Restatement (Second) of Contracts § 163 (1979). Fraud in the inducement, on the other hand, is fraud which induces the transaction by misrepresentation of motivating factors such as value, usefulness, age or other characteristic of the property or item in question. *See Adair v. Hustace, supra.*

Where there is fraud in the execution, the transaction is said to be void, precluding even good faith purchasers from obtaining good title to the subject property. *See* Restatement (Second) of Contracts § 163, comment *c*, at 444 (1979); 11 Am. Jur. 2d *Bills & Notes* § 690 (1963). If the fraud is merely in the inducement, however, the transaction is voidable, and good faith purchasers may acquire good title from the party guilty of fraud. *See* Restatement (Second) of Contracts § 163, *supra*; RCW 62A.3-305(c).

The general rule is that fraud is never presumed. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 457 P.2d 603 (1969). In the ordinary case, the plaintiff bears the burden of proving all essential elements of fraud by clear, cogent and convinc-

---

void. Respondents' counsel noted that if the deed were determined to be void, then City Bank personnel and bank experts would be unnecessary. City Bank and James Bibioff had no objection to this process, and the trial was bifurcated.

ing evidence. *Beckendorf*, at 462. To sustain a finding of common law fraud, the trial court in most cases must make findings of fact as to each of the nine elements of fraud.[10] *Howell v. Kraft*, 10 Wn. App. 266, 517 P.2d 203 (1973).

■ The rules stated in *Beckendorf* and *Kraft*, however, are not absolute. As is the case with undue influence, fraud may be presumed in equity where the donor and donee share a confidential relationship.[11] This was a quiet title action, brought in equity, where the court was faced with a highly suspect transaction between persons sharing a confidential relationship. Under the circumstances, we view a presumption of fraud as appropriate.

John Bibioff's home constituted virtually his entire estate. Ruby Pedersen testified that John was very proud of his home and that it was his "pride and joy". At the July 2, 1985, meeting, John executed a quitclaim deed giving his home to James, and he further executed a will making James the sole beneficiary of his estate.[12] There is no reason whatsoever why John Bibioff would suddenly disinherit his

---

[10]Those elements generally are: (1) a representation of an existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom it is made, (7) the latter's reliance on the truth of the representation, (8) his right to rely upon it, and (9) his consequent damage. *See Turner v. Enders*, 15 Wn. App. 875, 878, 552 P.2d 694 (1976).

[11]*See* 37 Am. Jur. 2d *Fraud & Deceit* § 439 (1968). *See also Dean v. Jordan*, 194 Wash. 661, 671-72, 79 P.2d 331 (1938) (in equitable action to contest a will, evidence may be of such a suspicious nature as to raise a presumption of fraud or undue influence); *In re Estate of Jaaska*, 27 Wn.2d 433, 447-51, 178 P.2d 321 (1947) (evidence presented by contestant in will contest was sufficient to raise presumption of fraud and undue influence); *Rhoads v. Borden*, 584 So. 2d 409, 413 (Miss. 1991) (since confidential relation existed between grantor and grantee, there is presumption that acts of grantee in obtaining deed were suspicious and fraudulent); *In re Kurtz*, 144 A.D.2d 468, 533 N.Y.S.2d 985 (1988) (in view of confidential relationship between son and mother, grantee son had burden of establishing that his agreement with his mother was not product of fraud or undue influence).

[12]James also executed a quitclaim deed giving the home back to his father. However, James kept the deed he executed and never delivered it to his father. Attorney Mary Jarvis apparently kept the quitclaim deed executed by John to James until James recorded it in November 1986.

granddaughter Tanya and give his entire estate to James, when both before and after the July 2 meeting he had expressed a strong desire that his granddaughter inherit from him. When later questioned about the possibility of an outstanding deed, John adamantly denied that any such gift had been made. There was considerable testimony regarding John's shock, outrage, disbelief and ultimate depression when he later discovered that the home was no longer his. Evidence was presented that James Bibioff told Pedersen that he had tricked John into unknowingly signing a quit-claim deed.

Under the circumstances of this case, we view this evidence as sufficient to give rise to a presumption of fraud. James Bibioff thus bore the burden of establishing that his father knew and understood the contents of what he signed during the July 2, 1985, meeting. As James failed to carry this burden, the trial court correctly ruled the deed to be void.

Judgment affirmed. The remainder of this opinion will not be published.

GROSSE, C.J., and KENNEDY, J., concur.

Reconsideration denied April 24, 1992.