# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| ANH-DUONG THI HO, personally and as the personal representative for the Estate of ANH DUNG HO, deceased, | ) ) ) ) | No. 76132-3-I |
|  | ) | DIVISION ONE |
| Respondents, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| MARY HO-MONG BACH, | ) ) | |
| Appellant. | ) ) ) | FILED: September 4, 2018 |

LEACH, J. — Mary Ho-Mong Bach (Bach) appeals from a trial court order quieting title to certain property in her deceased grandmother's successors-in-interest, Anh-Duong Thi Ho (Dee) and the estate of Anh-Dung Ho (Yomi).[1] First, Bach claims the trial court admitted testimony in violation of Washington's dead man's statute.[2] Second, she claims that the statute of limitations for fraud bars the action. Third, she claims that insufficient evidence supports the trial court's finding that a confidential relationship existed between Bach and her grandparents and the facts do not support the conclusion that the Hos did not

---

[1] Both Dee and the estate of Yomi are named respondents in this case. For simplicity, we refer only to Dee.

[2] RCW 5.60.030.

intend to gift the property to Bach. Dee cross appeals the trial court's decision not to disinherit Bach.

First, the trial court did not err in admitting any testimony because no party that testified about the transaction was a person in interest under the dead man's statute. Second, because of the confidential relationship between Bach and her grandparents, Bach is equitably estopped from asserting the statute of limitations defense. Third, substantial evidence supports the finding of a confidential relationship. In light of this relationship, the trial court did not err in looking at extrinsic evidence to decide the transfer was not a gift. Finally, the trial court did not err in declining to disinherit Bach because this is not a proper proceeding to do so. We affirm.

## FACTS

Andre Linh Tu Ho (Ho) and his wife Hong-Hoc Thi Dang (Dang) (together the Hos) emigrated from Vietnam with their family in 1975 to escape the Communist takeover.[3] They spent several months in refugee sites. Then a Catholic church in Renton sponsored the family. The church rented a house in Renton for their residence. In 1979, the Hos purchased the house from its owners. They paid off the mortgage in 1996. The house was the Hos' primary asset.

---

[3] The trial court's unchallenged factual findings are treated as true on appeal. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

Except for the Hos' oldest daughter, Mong-Diep Ho, the Ho children grew up in the house. They generally moved out after they married but still lived close to their parents. The Hos also cared for their grandchildren, including Bach, the oldest daughter of Mong-Diep Ho. By 2000, the Hos lived in the house with only Yomi, who had a developmental disability.

When the Hos arrived in the United States, they spoke and understood very little English. Ho took classes in English. But the trial court found that the Hos were far from fluent. They relied on their children and grandchildren to act as interpreters for tasks like filling in information on checks to pay bills, accompanying them to doctor visits, and corresponding with government agencies.

On March 27, 2001, the Hos signed a quitclaim deed transferring the house to Bach for "love and affection." Dang claims that the Hos signed the deed because Bach had told them that the government could take the house to pay for hospital expenses if they ever became seriously ill. They signed the deed to avoid this potential loss. Dang claimed that Bach promised to return the house to them and put a provision stating this in the quitclaim deed. Neither the quitclaim deed nor any of the accompanying documents contains the promised provision. Dang claimed that she and Ho trusted Bach to translate because they did not understand English and could not read the documents.

-3-

After delivering the deed, the Hos continued to live in the house. They paid all expenses and taxes related to the house. Sometime later, the Hos began to ask Bach to transfer the house back to them. Several witnesses testified that they saw Bach tell Ho that she would transfer the house back.

Ho died in July 2013. The trial court found that after Ho's death, Dang repeatedly asked Bach to transfer the house back to her. Each time, Bach told Dang that she was too busy. In August 2013, Dang and Dee went to Bach's office at the Veteran's Hospital to have her sign the papers to transfer title. Bach refused to see them. Hospital security escorted them off hospital grounds. One of Dang's children, Dung Ho, testified that after this incident Dang was hyperventilating, visibly shaken, and upset.

Dee and Dung Ho e-mailed Bach again, demanding that she transfer the house. Bach responded, stating she did not intend to "steal" the home, that her busy schedule at work made it difficult to take time off work, and asserting, "I have no bad intentions and will try to get this done as soon as I can." She later told Dung Ho, "I am arranging like I told you and will do it as soon as I can." She told Dee, "Thanks for the forms. I will try to get these done as soon as I can and call you."

Dang filed this lawsuit in December 2013. She died without a valid will in July 2014. Dee submitted Dang's holographic will to the probate court.

According to this document, Dang wished to leave all her property to Dee to be used in the care of Yomi. The probate court found the will was not valid. Then seven of Dang's children assigned their interests to Dee, ostensibly to honor Dang's wishes. Yomi did not assign her interest. Mong-Diep Ho assigned any interest in the property to her daughter, Bach.

After a five-day bench trial, the court found that the Hos did not intend to gift the property to Bach and that they signed the quitclaim deed without understanding the nature or consequences of the document. The trial court set aside the quitclaim deed. It quieted title in Dang's successors-in-interest. Thus, the trial court determined that Dee was entitled to an undivided 80 percent interest, Yomi was entitled to an undivided 10 percent interest, and Bach was entitled to an undivided 10 percent interest.

Bach appeals the trial court's decision to void the quitclaim deed. Dee appeals the trial court's decision that Bach has a 10 percent interest in the property.

ANALYSIS

Dead Man's Statute

First, Bach contends that the trial court improperly considered testimony in violation of Washington's dead man's statute. The parties assert that the appropriate standard of review for this issue is abuse of discretion. The dead

No. 76132-3-I / 6

man's statute involves the admission of evidence, and this court reviews evidentiary issues for abuse of discretion.[4] But the issue here—whether the witnesses were parties in interest—is a legal question that we review de novo.[5]

At trial, three of the Hos' children testified about the transaction: Xuan (Sue) Kinzler, Anh-Tuyet Thi Ho, and Dung Ho. Bach claims that the dead man's statute barred their testimony about the transaction because they are parties in interest. The dead man's statute prevents a person from testifying about a transaction with a deceased person if they have an interest in that transaction:

> [I]n an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, . . . then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person.[6]

"The purpose of the dead man's statute is to prevent interested parties from giving self-serving testimony regarding conversations and transactions with the deceased."[7] A party in interest is one who stands to gain or lose by the action in question.[8] Interest means pecuniary interest.[9] In addition, the interest must be a

---

[4] City of Spokane v. Neff, 152 Wn.2d 85, 91, 93 P.3d 158 (2004).
[5] See Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).
[6] RCW 5.60.030.
[7] Parks v. Fink, 173 Wn. App. 366, 375, 293 P.3d 1275 (2013).
[8] Hofsvang v. Estate of Brooke, 78 Wn. App. 315, 321, 897 P.2d 370 (1995).
[9] Deacy v. Coll. Life Ins. Co. of Am., 25 Wn. App. 419, 422, 607 P.2d 1239 (1980).

direct interest, "the test being whether the witness will gain or lose by the direct legal operation and effect of the judgment."[10] These witnesses originally had an interest in the property but assigned those interests to Dee before trial. Thus, Dee claims that they were no longer parties in interest. We agree.[11]

Bach contends that the witnesses acquired an interest in the litigation when Dang died without a valid will. She asserts that from that time they were interested parties and that they could not later change their status by assigning their interests to Dee. Bach primarily relies on an 1895 Washington Supreme Court case, Gilmore v. H.W. Baker Co.[12] We distinguish Gilmore. Gilmore held that a witness who was a party to a transaction with the deceased could not testify about the transaction after he had assigned his interest to a corporation in which he held stock and of which he was the president.[13]

> The facts that the present corporation (appellant) succeeded to the
> business . . . and that the witness became its president and one of

---

[10] State v. Robbins, 35 Wn.2d 389, 395, 213 P.2d 310 (1950); see also Adams Marine Serv. Inc. v. Fishel, 42 Wn.2d 555, 562-63, 257 P.2d 203 (1953) ("The mere contingency that one might be subjected to an independent claim or suit, depending upon the outcome of the action in which he is called as a witness, is not a disqualifying interest within the purview of RCW 5.60.030."); In re Estate of Sloan, 50 Wash. 86, 91, 96 P. 684 (1908) (stating that the interest must be a direct interest, present, certain, and vested, not uncertain, remote, or contingent).

[11] Dee makes several arguments to show that Bach waived the dead man's statute issue. But because we decide that the witnesses were not parties in interest, we do not address these arguments.

[12] 12 Wash. 468, 41 P. 124 (1895).

[13] Gilmore, 12 Wash. at 471-72.

its stockholders, did not remove the disability which the law imposes upon him as a party in interest. To hold otherwise would, for practical purposes, be to ignore the spirit of the statute, by permitting one, whom the law, from considerations of public policy requires to remain silent as to any transaction had by him with a deceased person, to evade the statute and avoid the disability imposed by it and become an effective witness merely by assigning his interest in the subject matter of the action, or by forming a corporation in which he might be the president and only stockholder, and thus by indirection accomplish that which the law prohibits to be done.[14]

Unlike in Gilmore, the witnesses here retained no interest, either direct or indirect, in the house and thus no pecuniary stake in the outcome of the litigation.

Bach also relies on Lee v. Northwest Trust & Savings Bank.[15] Lee and others sued the Bank, as executor, to reconvey mortgaged property, claiming that the secured debt had been paid.[16] Lee was one of the persons who signed the note, the mortgage, and the trust deed.[17] The court decided he was a party in interest even though he "disclaimed all interest in the case so far as he was concerned and stated that Lee was testifying for the other parties, not for himself."[18] The court found that Lee's "declaration of disclaimer of interest cannot have the effect of avoiding the provisions of the statute."[19] Lee is different

---

[14] Gilmore, 12 Wash. at 472.
[15] 128 Wash. 214, 222 P. 489 (1924).
[16] Lee, 128 Wash. at 214.
[17] Lee, 128 Wash. at 215.
[18] Lee, 128 Wash. at 215.
[19] Lee, 128 Wash. at 215-16.

from this case because Lee was a named party in the case and was one of the appellants from the trial court's judgment.[20]

This case is more like Olsen v. Kemoe[21] and Adams Marine Service Inc. v. Fishel.[22] In Olsen, the court allowed the chief witness to testify about a transaction because at the time the lawsuit started, he had no interest in the action.[23] Olsen held that

> where one ha[s] a claim of indebtedness against another, who subsequently dies, and he assigns it to another for a valuable consideration and retains no interest whatsoever therein, he is a competent witness to testify for the assignee in an action brought by the latter on the assigned claim against the estate of the deceased debtor.[24]

Similarly, in Adams, the witness, who had in good faith disposed of his stock and interest in the corporation, was not disqualified as a witness because of that former interest.[25] Like in Olsen and Adams Marine, the witnesses here had no pecuniary interest in the outcome of the litigation. So like those persons, the witnesses here are not persons in interest.

Bach attaches significance to the timing of the assignments. She points out that unlike in Olsen, the witnesses assigned their interests after the lawsuit

---

[20] Lee, 128 Wash. at 215.
[21] 132 Wash. 249, 231 P. 778 (1925).
[22] 42 Wn.2d 555, 257 P.2d 203 (1953).
[23] Olsen, 132 Wash. at 253.
[24] Olsen, 132 Wash. at 253.
[25] Adams Marine, 42 Wn.2d at 561.

was filed.[26] Bach contends that this raises an inference that the assignments were a tactical and not an economic decision. But Dang died after the lawsuit commenced and the probate court rejected her will. This explains the timing of the siblings' assignments. Further, "qualification or disqualification of a witness depends upon his interest at the time he testifies."[27]

In Adams Marine, the witness owned stock in the corporation at the time the lawsuit was filed but had disposed of it by the time he testified.[28] The court stated, "[T]here being no issue here as to the good faith of the transactions whereby Adams disposed of his stock and interest in the corporation, he was not disqualified as a witness by reason of his former interest in and active management of the respondent corporation."[29] Bach does not challenge the validity of the assignments. The record provides no support for her argument that the witnesses might somehow reacquire their interests. Thus, like in Adams Marine, the witnesses are not disqualified as a result of their former interest in the house.

Bach also attempts to distinguish this case from Olsen and Adams Marine by arguing the assignments lacked consideration. In both those cases, the

---

[26] See Olsen, 132 Wash. at 251 (noting that "at the time of the commencement of this suit and at the time of the trial, [the witness] had [no] interest in the sum sought to be recovered by this action").

[27] Adams Marine, 42 Wn.2d at 559.

[28] Adams Marine, 42 Wn.2d at 559.

[29] Adams Marine, 42 Wn.2d at 561.

witnesses transferred their interest for valuable consideration. But consideration for the assignments relates to their validity, something Bach does not challenge. So the sufficiency of consideration does not matter.

Finally, Bach contends that this case differs from Olsen and Adams Marine because, here, the witnesses assigned shares to an interested party who was barred from testifying. But Bach does not explain why this matters, and Olsen and Adams Marine do not find this fact significant.

In sum, we conclude that the witnesses were not persons in interests for purposes of RCW 5.60.030 and the trial court properly allowed them to testify.

## Statute of Limitations

Bach next claims that the trial court should have dismissed the case as time barred. Whether a statute of limitations bars a claim is a legal question an appellate court reviews de novo.[30] But first, we must decide if a statute of limitations applies. Bach contends that this is an action for fraud, which is subject to a three-year statute of limitation.[31] Dee asserts that because this is an action to quiet title, it is not subject to a statute of limitations.[32] "The gravamen of

---

[30] Bennett v. Comput. Task Grp., Inc., 112 Wn. App. 102, 106, 47 P.3d 594 (2002).

[31] RCW 4.16.080(4).

[32] Kent Sch. Dist. No. 415 v. Ladum, 45 Wn. App. 854, 856, 728 P.2d 164 (1986) ("There is no statute of limitations with regard to an action to quiet title."); Petersen v. Schafer, 42 Wn. App. 281, 284, 709 P.2d 813 (1985) ("Actions to quiet title are not subject to the statute of limitations.").

the claim determines the applicable statute of limitations."[33] We agree with Bach that the gravamen of the claim is fraud. Thus, the three-year statute of limitations applies.

Dee relies on Petersen v. Schafer,[34] which stated that an action to quiet title is not subject to the statute of limitations "even though fraud is practiced in creating the cloud, where the gravamen of the action is to quiet title." In Petersen, the defendant contended that a three-year statute of limitations should apply because the action was really one to recover real estate conveyed by a deed through fraud or mistake.[35] This court disagreed because the complaint did not allege any fraud in the procurement of the real property.[36] But, here, the first amended complaint alleges that fraud and intentional misrepresentation induced the Hos to transfer the property to Bach. And the trial court relied on this fraud to void the transfer, stating, "This Court concludes that the misrepresentation regarding the transfer back provision in the documents constitute fraud in the execution. The 2001 quitclaim deed transferring the house to Ms. Bach is therefore void." Thus, we distinguish this case from Petersen.

---

[33] Aberdeen Fed. Sav. & Loan Ass'n v. Hanson, 58 Wn. App. 773, 776, 794 P.2d 1322 (1990).
[34] 42 Wn. App. 281, 284, 709 P.2d 813 (1985).
[35] Petersen, 42 Wn. App. at 284.
[36] Petersen, 42 Wn. App. at 284.

Similar cases have applied the statute of limitations for fraud.[37] For example, in Morgan v. Morgan,[38] the court determined that the three-year statute of limitations for fraud should apply when the basis of the claim to set aside a deed was fraud. The court reasoned,

> The action cannot be classed as one to recover real estate, within the ten years' limitation statute, although the result might be, in case of a favorable termination of it for the plaintiff, to restore to her a portion of the lands quit-claimed to the defendant. To do this she must have the deed which she executed set aside, and for this purpose it is necessary to show that it was fraudulently obtained from her. The alleged fraud of the defendant is the basis of the plaintiff's action.[39]

Here, too, the plaintiffs rely on fraud to void the transfer. Thus, fraud is the gravamen of the claim and the three-year statute of limitations applies.

Next, the parties dispute when the fraud claim accrued. The statute of limitations for fraud accrues "when the party discovered, or with the exercise of due diligence could have discovered, the existence of the fraudulent conveyance."[40] Here, the basis for the trial court's finding of fraud is the absence

---

[37] Morgan v. Morgan, 10 Wash. 99, 108, 38 P. 1054 (1894); see also Aberdeen Fed. Sav., 58 Wn. App. at 776 (applying a three-year statute of limitations to an action to set aside a purported fraudulent conveyance); Kiener v. Hood, 126 Wash. 431, 432-33, 218 P. 1 (1923).

[38] 10 Wash. 99, 38 P. 1054 (1894).

[39] Morgan, 10 Wash. at 108.

[40] Aberdeen Fed. Sav., 58 Wn. App. at 776; Shepard v. Holmes, 185 Wn. App. 730, 739-40, 345 P.3d 786 (2014) (courts infer that a party has actual knowledge of fraud when by the exercise of due diligence, they could have discovered it).

-13-

of a reconveyance provision in the quitclaim deed. Thus, Bach contends, the Hos had actual notice of the claim when they signed the deed and the real estate excise tax affidavit, which stated that the property transferred as a gift. Washington law "presumes that someone who signs a document knows and understands its contents."[41] The Hos should have known at the time they signed the deed that it did not say what Bach represented that it would say. Thus, they had actual notice of the fraud when they signed the deed, and the fraud claim accrued at that time.[42]

Dee contends, however, that equitable estoppel bars Bach from raising the statute of limitations defense. We agree. "The gravamen of equitable estoppel with respect to the statute of limitations is that the defendant made representations or promises to perform which lulled the plaintiff into delayed timely action."[43] "'Equitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence.'"[44] The elements of equitable estoppel are

---

[41] Romney v. Franciscan Med. Grp., 199 Wn. App. 589, 603, 399 P.3d 1220, review denied, 189 Wn.2d 1026 (2017).

[42] Bach also contends that the Hos had constructive notice of the claim. But because we decide that the Hos had actual notice of the claim, we do not consider this argument.

[43] Peterson v. Groves, 111 Wn. App. 306, 311, 44 P.3d 894 (2002).

[44] Peterson, 111 Wn. App. at 310 (quoting Robinson v. City of Seattle, 119 Wn.2d 34, 82, 830 P.2d 318 (1992)).

(1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission.[45]

The existence of a confidential relationship is a key indicator of reliance.[46]

In Peterson v. Groves,[47] for example, the court held evidence of a confidential relationship, combined with evidence of a false promise, was sufficient to overcome summary judgment on the issue of equitable estoppel. There, Peterson loaned money to his stepson, Groves.[48] The loans were reduced to two promissory notes executed in 1982 and 1985.[49] Groves promised to pay off the notes with the proceeds from the sale of property he owned, and because of their close relationship, Peterson believed him.[50] Groves did not sell the property until 1998 and received the proceeds from the sale in 1999.[51] Peterson filed a lawsuit in 2001.[52] The court noted that the statute of limitations on enforcing the notes had long passed.[53] Because of the confidential relationship between

---

[45] Peterson, 111 Wn. App. at 310.
[46] Peterson, 111 Wn. App. at 311-14.
[47] 111 Wn. App. 306, 44 P.3d 894 (2002).
[48] Peterson, 111 Wn. App. at 308.
[49] Peterson, 111 Wn. App. at 308.
[50] Peterson, 111 Wn. App. at 309.
[51] Peterson, 111 Wn. App. at 309.
[52] Peterson, 111 Wn. App. at 310.
[53] Peterson, 111 Wn. App. at 310.

Peterson and Groves, however, the court found that the claim of equitable estoppel had substance.[54]

This case is like Peterson. The statute of limitations on the fraud claim accrued more than three years before Dang filed suit. But because of their confidential relationship, the Hos reasonably relied on Bach's promises that she would return the property. Ho and Dang repeatedly asked her to transfer the property back. And Bach repeatedly told them that she would. Because of the confidential relationship between Bach and her grandparents, their reliance on these promises was reasonable and caused them to delay in filing an action to recover their property. Thus, Bach is estopped from asserting the statute of limitations defense.

### Confidential Relationship

Bach challenges the trial court's decision to shift the burden of proof to Bach to establish the absence of fraud. She specifically challenges the trial court's finding that Bach had a confidential relationship with her grandparents and, as a result, had the burden to rebut the presumption of fraud.

Where a court evaluates evidence in a bench trial, an appellate court limits its review to determining whether substantial evidence supports the findings of

---

[54] Peterson, 111 Wn. App. at 313-14.

fact and, if so, whether the findings support the conclusions of law.[55] Substantial evidence is evidence sufficient to persuade a rational fair-minded person of the evidence.[56] Appellate courts do not substitute their view of the facts in the record for those of the trial judge.[57] They view the evidence and all reasonable inferences in the light most favorable to the prevailing party.[58] The court defers to the trial court's assessment of witness credibility and evidence weight.[59]

Generally, "the party seeking to set aside an inter vivos gift has the burden of showing the gift is invalid."[60] When a confidential relationship exists, however, the burden shifts to the donee to prove by clear, cogent, and convincing evidence that the gift was intended and not the product of undue influence.[61] "Whether a confidential relationship exists is a question of fact."[62] "'A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.'"[63] "Family

---

[55] Standing Rock Homeowners Ass'n v. Misich, 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001).

[56] Dickie, 149 Wn.2d at 879.

[57] Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 575, 343 P.2d 183 (1959).

[58] Korst v. McMahon, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006).

[59] In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

[60] Endicott v. Saul, 142 Wn. App. 899, 922, 176 P.3d 560 (2008).

[61] Endicott, 142 Wn. App. at 922; Pedersen v. Bibioff, 64 Wn. App. 710, 720, 828 P.2d 1113 (1992).

[62] Endicott, 142 Wn. App. at 922.

[63] Kitsap Bank v. Denley, 177 Wn. App. 559, 572, 312 P.3d 711 (2013) (internal quotation marks omitted) (quoting McCutcheon v. Brownfield, 2 Wn.

relationships are particularly likely to create confidential relationships."[64] Here,

the trial court found that

> Ms. Bach was in a confidential relationship with Mr. Ho and Mrs. Dang. She was a member of a large close knit refugee family with a special history of hardships. Through both her family and her professional positions, Ms. Bach was held in trust by her grandparents, Mr. and Mrs. Ho. Combined with their lack of fluency in English, Mr. and Mrs. Ho trusted and relied on Ms. Bach to accurately and honestly protect and assist them with their primary asset.

The court stated in a footnote that it "finds credible that Vietnamese culture held

a higher expectation of trust and responsibility from the eldest child and the

eldest grandchild."

This case is similar to Pedersen v. Bibioff.[65] In that case, the court found

the existence of a confidential relationship between a father, John, and his son,

James.[66] The court noted that substantial evidence supported the trial court's

finding that a confidential relationship existed because of the familial relationship:

they were living together, the relationship was one of trust, love, and devotion,

and the father relied on his son to assist in paying bills and taking care of

business matters.[67] In addition, John was unable to read, write, or understand

---

App. 348, 357, 467 P.2d 868 (1970)); see also Lewis v. Estate of Lewis, 45 Wn. App. 387, 391, 725 P.2d 644 (1986).

[64] Kitsap Bank, 177 Wn. App. at 572 (citing McCutcheon, 2 Wn. App. at 357).

[65] 64 Wn. App. 710, 828 P.2d 1113 (1992).

[66] Pedersen, 64 Wn. App. at 719.

[67] Pedersen, 64 Wn. App. at 719.

written English, so he relied on James to help translate documents.[68] Like in Pedersen, the Hos and Bach had a familial relationship characterized by affection and trust. And because of their lack of fluency in English, the Hos relied on Bach, as well as their children, to help them with business matters. This is substantial evidence supporting the trial court's finding of a confidential relationship.

Bach relies on Kitsap Bank v. Denley.[69] But this case is distinguishable. In Kitsap Bank, Correll (the decedent) considered a close friend, Lanterno (the beneficiary), to be like family and believed that Lanterno would act in her best interests.[70] But the court noted that there was no evidence that Correll was in a particularly vulnerable state.[71] She lived by herself and was capable of managing her affairs.[72] The Hos, on the other hand, relied on their children and grandchildren for a multitude of tasks.

Bach also specifically challenges the court's finding she was in a professional position at the time of the transfer. She claims that without this preliminary factual finding, insufficient facts support its ultimate finding about the confidential relation. If a trial court's preliminary finding is not supported by

---

[68] Pedersen, 64 Wn. App. at 719.
[69] 177 Wn. App. 559, 312 P.3d 711 (2013).
[70] Kitsap Bank, 177 Wn. App. at 573.
[71] Kitsap Bank, 177 Wn. App. at 573.
[72] Kitsap Bank, 177 Wn. App. at 573.

-19-

substantial evidence and the remaining preliminary findings, taken together, do not provide substantial evidence to support the ultimate finding, the court should reverse.[73]

Bach notes that at the time of the transfer she was not yet a doctor. So she did not have the professional position that the trial court relied on to find the confidential relationship. But the trial court's findings do not indicate that it relied on her position as a doctor to find the confidential relationship. Rather, the court found that, in part, because of "her area of study" Bach was entrusted with title to the property. At the time of the transfer, Bach was in college, pursuing a pharmacy degree. Further, in addition to Bach's position, the court relied on the familial relationship, the Vietnamese culture of honor and trust, and Bach's proficiency in English relative to the Hos. That Bach was not yet a doctor in 2001 does not undermine the trial court's finding of a confidential relationship in light of the other evidence to support its conclusion.

Substantial evidence supports the trial court's finding that a confidential relationship existed. So the trial court did not abuse its discretion when it shifted the burden of proof to Bach to show that the transfer was, in fact, intended as a gift.[74]

---

[73] City of Sunnyside v. Gonzalez, 188 Wn.2d 600, 613, 398 P.3d 1078 (2017).
[74] See Pedersen, 64 Wn. App. at 720.

-20-

### Evidence of Intent That the Property Was a Gift

Next, Bach claims that the trial court erred when it concluded that the Hos did not intend to gift the house to her. She specifically asserts that the court should not have used extrinsic evidence to interpret an unambiguous deed. Generally, if the plain language of a deed is unambiguous, the court will not consider extrinsic evidence.[75] But this rule does not apply in the case of fraud.[76] Here, the court concluded that "the misrepresentation regarding the transfer back provision in the documents constitute fraud in the execution." Fraud in the execution is a deception about the contents of the instrument.[77] Thus, the contents of the instrument cannot be relied on to determine intent. Because the court found evidence of fraud in the execution, it properly considered extrinsic evidence to determine no gift was intended.

Further, "[i]f a confidential relationship exists, evidence to sustain the gift 'must show that the gift was made <u>freely, voluntarily, and with a full</u>

---

[75] <u>Dickie</u>, 149 Wn.2d at 880.

[76] <u>Lynott v. Nat'l Union Fire Ins. Co.</u>, 123 Wn.2d 678, 683, 871 P.2d 146 (1994) (observing that "'parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident or mistake'" (quoting <u>Berg v. Hudesman</u>, 115 Wn.2d 657, 669, 801 P.2d 222 (1990))); <u>U.S. Life Credit Life Ins. Co. v. Williams</u>, 77 Wn. App. 861, 864, 894 P.2d 566 (1995) ("Absent fraud, accident or mistake, parol evidence is not admissible to add to, modify, or contradict the terms of a written contract.").

[77] <u>Pedersen</u>, 64 Wn. App. at 722.

-21-

understanding of the facts.'"[78] Where courts have found a confidential relationship exits, they have used extrinsic evidence to determine if a gift was intended.[79] When evidence shows that the deed was obtained through undue influence, the deed itself cannot be used to show that a gift was intended. The language of the deed cannot rebut the presumption that the deed was obtained through fraud.

Bach also asserts that there is a legal presumption of validity for gifts between close family members. Bach relies on the court's finding that Bach was close to Ho and saw him as a father figure. But Bach cites no authority to show that such a presumption exists. Instead, she relies on the rule that "love and affection is a sufficient consideration for a deed of gift between parent and child."[80] But adequacy of consideration for a gift does not create a presumption that the gift is valid in light of evidence that the gift was obtained as a result of fraud.

We find no error in the trial court's conclusions that the Hos did not intend to gift the property to Bach.[81]

---

[78] Pedersen, 64 Wn. App. at 721 (quoting McCutcheon 2 Wn. App. at 356).

[79] See Pedersen, 64 Wn. App. at 720-21.

[80] Lehman v. Columbia Fire Ins. Co., 188 Wash. 640, 643, 63 P.2d 442 (1936).

[81] Dee makes the alternative argument that the record establishes a constructive trust. But because we decide that substantial evidence supports the trial court's finding that a confidential relationship exists and Bach failed to rebut

## Cross Appeal

Dee cross appeals. She contends the trial court should have disinherited Bach. The trial court quieted title of the house in the beneficiaries of Dang's estate. This included Bach. Bach responds that disinheriting Bach is not an available remedy in this proceeding. We agree with Bach. Dee relies on Washington's slayer statute.[82] RCW 11.84.020 prevents a financial abuser from receiving any property or other benefit from a decedent's estate: "No slayer or abuser shall in any way acquire any property or receive any benefit as the result of the death of the decedent." Actions under the slayer abuser statutes are "matters"[83] under the Trust and Estate Dispute Resolution Act (TEDRA).[84] This chapter states that any judicial proceeding under Title 11 RCW must be commenced as a new action.[85] Thus, the court would have abused its discretion if it disinherited Bach in this proceeding.

---

the presumption that the gift was not intended, we need not consider this argument. We note, however, that the trial court did not determine that equity required imposition of a constructive trust or make the necessary findings to support a constructive trust. Thus, the record is insufficient for this court to decide to impose a constructive trust.

[82] Ch. 11.84 RCW.
[83] RCW 11.96A.030(2)(e).
[84] Ch. 11.96A RCW.
[85] RCW 11.96A.090(2).

## Attorney Fees

Bach requests fees on appeal. This court may award fees to the substantially prevailing party on review.[86] Because Bach does not prevail in her appeal, we do not award her fees.

Bach also requests fees incurred in the cross appeal. She prevails in the cross appeal. She asserts that she is entitled to fees under TEDRA. RCW 11.96A.150 gives courts discretion to award fees to all proceedings governed by Title 11 RCW. But Bach argued that Dee's cross appeal fails because it is not a proceeding under Title 11. She contends that whether RCW 11.84 applies is an issue under TEDRA. Because this issue is not truly a matter under TEDRA, she is not entitled to fees. Further, Dee's cross appeal is small in proportion to the numerous issues raised by Bach, and Bach does not prevail in her appeal. We decline to award Bach fees for the cross appeal.

Finally, Bach requests attorney fees in connection with a motion to substitute. In February 2018, while this appeal was pending, Yomi, one of the named respondents, died. RAP 3.2(a) requires substitution of parties to a review "when it appears that a party is deceased." Under RAP 3.2(b), "[a] party with knowledge of the death . . . shall promptly move for substitution of parties." The rule also states that "[i]f a party fails to promptly move for substitution, the

---

[86] RAP 14.2.

-24-

personal representative of a deceased . . . or the successor in interest of a party, should promptly move for substitution of parties."[87] Dee filed no motion to substitute parties. Bach's counsel sent two letters, first asking if Dee's counsel would file the RAP 3.2 motion and then requesting that they do so no later than April 5, 2018. The record does not show that Dee's counsel responded to the letters. Later in 2018, Bach filed a motion to substitute a party for the deceased respondent, and we granted the motion. Bach asks for attorney fees for this because Dee did not promptly file a motion to substitute parties as required by RAP 3.2. But the rule did not impose the duty to move to substitute solely on Dee. As a party with knowledge of Yomi's death, Bach too could have filed the motion. For this reason, we deny Bach's request for fees on the RAP 3.2 motion.

## CONCLUSION

First, the trial court did not consider testimony in violation of Washington's dead man's statute because no witness who testified about the transaction was a person in interest. Second, equitable estoppel bars Bach from asserting the statute of limitations defense. Third, substantial evidence supports the trial court's findings about the existence of a confidential relationship and Bach's failure to rebut the presumption that no gift was intended. Finally, the trial court

---

[87] RAP 3.2(b).

-25-

did not err in declining to disinherit Bach in this proceeding. For these reasons, we affirm.

Leach, J.

WE CONCUR:

Spearman, J.P.T.     Schindler, J.